EDWARDS and another, Plaintiffs and Respondents, vs. CUT-
LER-HAMMER, INC., Defendant and Respondent:
ESCHWEILER and another, Defendants and Appellants.

*January 10—February 7, 1956.*

For the appellants there were briefs by *Lines, Spooner & Quarles,* attorneys, and *Charles B. Quarles* of counsel, all of Milwaukee, and oral argument by *Charles B. Quarles.*

For the respondent Cutler-Hammer, Inc., there was a brief and oral argument by *Ray T. McCann* of Milwaukee.

For the respondents Roy Edwards and Hardware Mutual Casualty Company there was a brief and oral argument by *Lawrence D. Gillick* and *Walter G. Seher,* both of Milwaukee.

FAIRCHILD, C. J.   This case involves facts relative to the doctrine of a "borrowed employee." The law is clear that if the one to whom an employee is lent is the master of the servant at the very time the negligent act occurs, it is upon him, as a special employer, that the liability rests. If the one lending the employee is his master at the very time of the injury, then he, as general employer, contracts the liability.

In the first place, in order that the general employer be relieved from liability and the special employer become liable, there must be a consensual relationship between the employee and the borrowing or special employer. Since the employee-employer relationship is based on contract, it is essential that the employee understand the existence of and agree to the temporary new relationship. If such a consensual relation-

ship, either express or implied, does not exist, then the law is clearly settled that the one to whom the employee is lent is not his master and cannot be held liable for the servant's negligent act. It, therefore, follows that the general employer remains the master of the servant, and the liability is his.

Where the necessary consensual relationship has been established, the difficulty in applying the general law of liability arises in determining who is the employer at the time of the negligent act. Two recognized tests have been generally applied to the question of who the employer is: (1) The "control test," based on who had control of the employee at the time of the occurrence of the negligent act; (2) the "whose-business test," based on whose business was being furthered at the time of the negligent act. However, it has been held that the crucial test is the control test, as the "whose-business test" is governed by who had control, and, also, the employee might have been furthering the business of both. 57 C. J. S., Master and Servant, p. 289, sec. 566; *Mature v. Angelo,* 373 Pa. 593, 595, 97 Atl. (2d) 59, 60; *Anderson v. Abramson,* 234 Iowa, 792, 13 N. W. (2d) 315.

Much of the case law on the subject of a "borrowed employee" has developed from those cases involving the hiring or lending of a team and carriage with driver, automobile and chauffeur, truck and driver, and heavy equipment, such as a crane, and operator. The holdings in those cases that the general employer was the master of the employee at the time of injury were based upon the fact that the general employer had the right of control over the employee because the general employer and owner of the equipment had the sole right to hire the employee and to select the employee who was to operate that equipment, and that he, the general employer, was the only person who had the right to discharge the operator. The operator's duty to take care of the equipment and to operate it in a safe manner was a duty he owed to his general employer. It is reasoned that the owner and general employer had the responsibility of furnishing to the

hirer a safe piece of equipment, and, the instrumentality and operator being considered as an entity, where the negligent act was the failure of the operator in respect to control, management, or lookout in the operation of the instrumentality, the employee was at the very time of the negligent act in the employ of and under the control of his general employer as to that act. The above rule has been applied by this court in *Hoefer v. Last,* 221 Wis. 102, 110, 111, 266 N. W. 196; *Packard v. Industrial Comm.* 213 Wis. 1, 45, 250 N. W. 768; *De Forest Dairy Co. v. Friedrich,* 202 Wis. 251, 255, 232 N. W. 543; *Wagner v. Larsen,* 174 Wis. 26, 182 N. W. 336; *Boehck Equipment Co. v. Industrial Comm.* 246 Wis. 178, 184, 185, 16 N. W. (2d) 298.

If, in the situation in which an owner of a team of horses or an automobile leases or lends such property to another together with a driver or operator who is the employee of the owner, it is held that the owner is liable for acts of negligence of the driver or operator because of the owner's reserved right of control including power to discharge, the facts in the instant case appear even stronger for the application of such principle. Here the physical possession of the machine (the crane) was not intrusted to another but remained on the premises of the owner and general employer (Cutler-Hammer). Other facts applying to the instant case which would tend to indicate the general employer's intention to retain control are that the employee was a specially skilled person whose services were necessary to the act performed; that the employee was in the normal course of his employment; that the time for which he was loaned to perform the task was relatively short (about one and one-half hours).

Cases of the type just discussed are to be distinguished from those cases in which an employee, loaned with his consent to a special employer, completely severs his relation for the time being with his general employer. Such was the

situation in *Rogers v. Valley Outdoor Theater Co.* 262 Wis. 658, 56 N. W. (2d) 503, upon which respondent Cutler-Hammer relies. In that case, the evidence made it clear that the employee was chosen and hired by Rogers to do the work Rogers wanted done. Rogers had the right to discharge him at any time. No equipment of the general employer was involved. The work was done after the employee had finished with his general employer's work. He was not doing acts within the general course of his employment, and no special skill was involved, which demanded his services in particular.

In *Wagner v. Larsen, supra,* this court pointed out (p. 29):

" 'It is well settled at common law that where an employee with his own consent was loaned to a special employer he became the servant of such employer.' *Cayll v. Waukesha G. & E. Co.* 172 Wis. 554, 179 N. W. 771; *Standard Oil Co. v. Anderson,* 212 U. S. 215, 29 Sup. Ct. 252. To this rule, however, an exception has been firmly established by a well-nigh unbroken line of decisions, which exception may be stated as follows: Where an owner hires his team and driver, or his automobile and chauffeur, or his machine and operator to another to do work to be designated and as directed by the hirer, the hirer having no authority by the terms of the contract of hire to discharge the driver, chauffeur, or operator and substitute another, the driver, chauffeur, or operator remains the servant of the owner in matters relating to the safety and management of the team, automobile, or machine, and the owner is liable to third persons for damages resulting from the negligent management or operation of the team, automobile, or machine by such servant. . . .

"The reason is that the hiring is not of the team distinct from the driver or of the driver distinct from the team, but is the hiring of the entity composed of the two. While the hirer acquires dominion or authority over the entity to designate the work that shall be done and direct the manner of doing it, he acquires no authority to direct how the team shall be driven, managed, or cared for, nor can he divide the entity by separating the driver from the team. He may dispense with the services of the entity—the driver and the

team—but he cannot discharge the driver and substitute another. The safety and well-being of the team is a matter of concern to the owner."

Liability is placed on the general employer who hires or lends a machine and its operator not only because he retains control of the employee with respect to the operation of the machinery but because the negligent act arises from some negligence of the operator in connection with the aspect of control which he retains. This raises the question of division of control. In *Wagner v. Larsen, supra,* this matter is clearly dealt with. There, as in analogous cases, the general employer of the driver of a rented truck was held liable because the negligent act arose from his employee's negligence in operating the truck, an aspect as to which his general employer retained the right to control. However, it is illustrated there that since the hirer of the truck had the right to control where the truck should go, if the driver had driven the heavily loaded wagon over an adjacent lawn in approaching a customer's dwelling, the coal company would have been liable for damages. This court there said (p. 31) : "It is entirely possible and consistent, as pointed out in *Driscoll v. Towle,* 181 Mass. 416, 63 N. E. 922, for the driver to be the servant of the hirer in the general performance of the work and remain the servant of the owner in the details of driving, caring for, and managing of the team." But there is no inference that because the general employer has permitted a division of control he has surrendered it. He is still liable for the acts of his servant committed with respect to the aspects in which he (the general employer) retains the right to control.

Since, as stated in effect in Restatement, 1 Agency, p. 498, sec. 226, "An employee may be an employee of two masters, not joint masters, at the same time as to the same act, provided that service to one does not involve abandonment of

service to the other," circumstances may arise under which the interests of a special employer and of a general employer in the performance of a single act by an employee are such as to involve an identical objective. When the facts show that such a situation exists, both employers have been held severally liable for an injury to a third person. A recent case holding such a possibility is *Dickerson v. American Sugar Refining Co.* (3d Cir.), 211 Fed. (2d) 200. In that case, a nurse was employed by an industrial plant for the purpose of treating its employees in case of accident. The plant also employed a doctor to come in several times a week. In addition to rendering service to the plant employees, he served nonemployees who might be in the plant, on a fee basis. The nurse acted for both the doctor and for the American Sugar Refining Company. Even though the company retained the right to choose the nurse, hire or discharge her, it was held that because the interest of the doctor and the general employer was of such a mutual character, that it would be possible for both to be held liable for the negligent act of the nurse under the facts. This possibility was predicated upon the assumption that the doctor was an independent contractor. Judge STALEY, speaking for the court, said (p. 203) :

". . . we think it could be found that both parties had some measure of control. . . . From the nurse's testimony, it could be inferred that the defendant's purpose was to supply first aid to those injured at the refinery. The doctor's services were retained for the same purpose but on a more expert level and possibly on the basis of an independent-contractor relationship. Therefore, his objective, assuming he was an independent contractor, was the same as defendant's. Hence, while assisting the doctor, the nurse could be found to have been acting under the supervision, actual or potential, of both defendant and doctor, since she would be carrying on work which was of mutual interest to both and to effect their common purpose. Clearly, assisting the doctor would not necessarily involve an abandonment of her service for

defendant; nor does the fact that defendant may have permitted a division of control compel the conclusion that it was given up entirely."

In *Südekum v. Animal Rescue League,* 353 Pa. 408, 45 Atl. (2d) 59, the facts are as follows: A policeman was employed by the city, which had the sole right to hire and discharge him. It was a statutory duty of the city to use its policemen to keep stray dogs off the streets and to assign to the Animal Rescue League a certain number of policemen to assist it while it co-operated in this task. The city had the right to choose the policemen to be assigned. In this instance the policeman chosen was not acceptable to the league, but it had to use him because the city had the right to elect whom it sent. The policeman drove one of the league's trucks. An accident occurred through his negligence in driving the truck. It was held that both the city and the league had the same objective and that their interests were mutual. Although that case involved a further issue, it was there said with respect to mutual liability (p. 414):

"In the present case the jury found, from what we regard as amply sufficient evidence, that when Jackson was driving the truck at the time of the accident he was acting on behalf of both the city of Pittsburgh and the Animal Rescue League, and that therefore, as far as this phase of the litigation is concerned, both these defendants were liable for the death caused by his negligence. The seizure and detention of stray dogs was the objective of both the city and the league, the one in pursuance of its statutory duty, the other of its chartered purpose. It was essentially a common enterprise."

The instant case involves the following facts: Respondent, Cutler-Hammer, Inc., was in the process of making a new addition to its manufacturing plant. It engaged a contractor to do the work, and Eschweiler and Eschweiler, appellants, were the architects. One Klettke was an employee of Eschweiler and Eschweiler, and his duty was to see that the

plans and specifications were carried out by the general contractor. On the morning of the accident, he desired to inspect a window sash which was located high up in the part of the building being constructed. One Kiefert was a crane operator in the general employ of Cutler-Hammer. At the time Klettke decided to inspect the window sash he went to the superintendent of the crane operator and asked if he could get up on the crane in order to make the inspection. He went with the operator, got up on the crane, and made his inspection of the sash. At that time the crane was not being operated but was in a stationary position. During the time he was inspecting the sash he was standing on the rails along which the crane moved when it was in operation. The cab of the crane was some feet below the rails. When he finished the inspection of the sash, he climbed down into the cab. At that time he was informed by Kiefert that the rails were not smooth, and it was decided between them that he would test the rails. In order to do so it was necessary to operate the crane along the length of the rails which extended into the part of the plant under construction. Workmen of the general contractor were working in that area. One of these, Roy Edwards, was laying some conduits, and in the performance of his work he was stationed on a ladder about 18 feet from the floor of the building. The top of his ladder was resting on the rails and extended about 18 inches above the rails. As the crane, at this time moving along the rails at a slow rate of speed, came to the point where the ladder was resting, it struck the top of the ladder, and Edwards was knocked to the floor and injured. Klettke, the inspector, was on a platform of the cab inspecting the rails some feet above as the crane moved down the track. Kiefert, the operator, was watching him closely in order to avoid a possible accident as he (Klettke) stood in this precarious position. Kiefert testified that as he operated the crane he observed the top of the ladder but that his mind and attention were on

Klettke, and the matter of the ladder slipped his mind. There is some conflict in the testimony as to orders given by Klettke.

Respondent, Cutler-Hammer, was admittedly the general employer of the crane operator, Kiefert. As employer it would ordinarily be liable for the act of its servant under the doctrine of *respondeat superior* because of its superior control over its subordinate. "If he can show that he has loaned the servant to another and surrendered to the borrower all direction and control over him, then the borrower becomes the master, who is alone liable for the acts of the servant. But the burden is upon the general employer to establish not only that he loaned the servant but that he surrendered control and direction over the servant to the borrower." *Anderson v. Abramson, supra,* page 794. The presumption is, then, that the employee is under the control and direction of the general employer. The general employer may rebut that presumption by showing that he relinquished full control of his employee. In *Hooper v. Brawner,* 148 Md. 417, 430, 129 Atl. 672, the principle is stated that, "it was incumbent upon the defendant, in order to break down the presumption that he was responsible, arising from the fact that the negligent act was done by his servant in the operation of an instrumentality owned by him, to show affirmatively as a matter of fact that he had not at the time of the accident, the right to control or direct the servant, and we do not think it can be conclusively said as a matter of law that he has met that burden by the bare statement that he had 'loaned' the servant to another. He must go further and show that when he loaned him he surrendered to the borrower the right to control and direct him." In the instant case, respondent, Cutler-Hammer, has failed to produce any evidence conclusively showing that the Eschweilers assumed exclusive control over the employee loaned to them. The facts in the record as now before us indicate that it was Cutler-

Hammer's intention to retain control of the loaned employee, and the presumption has not been rebutted.

However, both Eschweiler and Eschweiler and Cutler-Hammer, Inc., were interested in seeing that the work of the general contractor was satisfactorily done before acceptance. The objectives sought by each by the performance of the act of the negligent servant were identical.

The trial court, in directing the verdict in favor of Cutler-Hammer based his decision upon the following findings, among others: (1) That Kiefert, the crane operator, was not in his normal course of employment because he was not hauling steel; (2) that the Eschweilers' agent was directing the operator where to go and when to stop; (3) that it was the Eschweilers' business which was being furthered. Kiefert was the person employed by Cutler-Hammer to operate the crane. If there was any need to have the crane operated, whether it was hauling steel or whether it was empty, Kiefert was the person hired to do it. The Eschweilers' agent may have told the operator where to go and when to stop, but "the control necessary to make the borrower the master must be something more than a right to point out the work to do." *Anderson v. Abramson, supra,* page 795. The "whose-business test" has been generally held to be governed by the "control test." There is nothing in the record from which, as a matter of law, it could be inferred that appellants, the Eschweilers, are alone liable. The fact that there was a division of control would not lead to an inference that the general employer had surrendered full control.

From the material and relevant circumstances disclosed in the record, questions of fact exist, and they must be properly determined by the trial court before judgment can be rendered. Facts ultimate in their nature are before us relative to the question of master and servant. The issues have not been fully tried. Inasmuch as Cutler-Hammer, Inc., was excluded from participating in the argument to the jury as a

result of the directed verdict, we consider that there must be a new trial on all issues.

*By the Court.*—Judgment reversed, cause remanded with directions to vacate the orders dismissing the complaint and cross complaint against Cutler-Hammer, Inc., and to grant a new trial.