SPRINGFIELD LUMBER, FEED & FUEL COMPANY and another, Appellants, v. INDUSTRIAL COMMISSION and others, Respondents.

*April 8—May 3, 1960.*

For the appellants there were briefs by *R. A. Huevler* and *Kivett & Kasdorf,* attorneys, and *Nonald J. Lewis* and *Kenton E. Kilmer* of counsel, all of Milwaukee, and oral argument by *Mr. Lewis, Mr. Kilmer,* and *Mr. Huevler.*

For the respondent Industrial Commission the cause was argued by *Mortimer Levitan,* assistant attorney general, with whom on the brief was *John W. Reynolds,* attorney general.

For the respondents Charles F. Schinke Dairy, Inc., and Aetna Casualty & Surety Company there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Edmund W. Powell, Kurt H. Frauen,* and *Phillip E. Crump* of counsel, all of Milwaukee, and oral argument by *Mr. Frauen.*

CURRIE, J.   We are here concerned with the troublesome question of a so-called "loaned employee."

The issue before the commission was whether Vernon K. Schinke at the time he incurred his injury continued to be

the employee of his original employer, the dairy company, or had become the employee of the special employer, the lumber company. The commission determined that he had become the employee of the special employer, and the appellants challenge such holding.

The essential tests to be applied in determining whether a loaned employee retains his employment with his original employer, or becomes the employee of the special employer, are set forth in *Seaman Body Corp. v. Industrial Comm.* (1931), 204 Wis. 157, 163, 235 N. W. 433, as follows:

"The vital questions in controversies of this kind are:

"(1) Did the employee actually or impliedly consent to work for a special employer?

"(2) Whose was the work he was performing at the time of injury?

"(3) Whose was the right to control the details of the work being performed?

"(4) For whose benefit primarily was the work being done?"

Of these four stated tests, the most-important one is the first, viz., did the employee actually or impliedly consent to work for the special employer. *Hanz v. Industrial Comm.* (1959), 7 Wis. (2d) 314, 96 N. W. (2d) 533. Mortimer Levitan, in his article entitled, "Loaned Employees," 27 Wisconsin Bar Bulletin, October, 1954, pages 7, 8, succinctly states:

"An employee simply cannot be transferred to a special employer without his consent." [1]

---

[1] As cases supporting such statement the author cites: *Spodick v. Nash Motors Co.* (1931), 203 Wis. 211, 213, 214, 232 N. W. 870; *Rhinelander Paper Co. v. Industrial Comm.* (1931), 206 Wis. 215, 217, 239 N. W. 412; *Wisconsin Holding Corp. v. Industrial Comm.* (1934), 215 Wis. 67, 71, 72, 254 N. W. 115; *Northern Trust Co. v. Industrial Comm.* (1939), 231 Wis. 133, 285 N. W. 339; *Hudson v. Industrial Comm.* (1942), 241 Wis. 476, 6 N. W. (2d) 217; *Boehck Equipment Co. v. Industrial Comm.* (1944), 246 Wis. 178, 187, 188, 16 N. W. (2d) 298.

1 Larson, Law of Workmen's Compensation, p. 710, sec. 48.10, points out the necessity of there being a contract of employment between the loaned employee and the special employer before such employee can be determined to have been employed by the special employer. We quote from such section of this text as follows (p. 711):

"In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered 'Yes,' the investigation is closed, and there is no need to go on into tests of relative control and the like."

The finding by the commission that Vernon Schinke at the time of injury was the employee of the special employer, the lumber company, is a finding of an ultimate fact which satisfies the requirements of sec. 102.18 (1), Stats. *Hanz v. Industrial Comm., supra.* This is true even though the question of whether an employee-employer relationship exists presents a question of law. However, in a situation in which the facts are undisputed and but one reasonable inference can be drawn therefrom, such finding of ultimate fact constitutes but a conclusion of law which is not binding upon a reviewing court. *Brown v. Industrial Comm.* (1960), 9 Wis. (2d) 555, 569, 101 N. W. (2d) 788, and *Van Roy v. Industrial Comm.* (1958), 5 Wis. (2d) 416, 425, 92 N. W. (2d) 818.

The appellants contend that the finding by the commission, that Vernon Schinke at the time of his injury was the employee of the lumber company, is such a conclusion of law. In support of such contention it is argued that from the undisputed testimony it appears that he never intended to become the employee of the lumber company, and they point to the following testimony given by him:

"*Q.* Was it your intention, when you went over there, that you were working there as an employee of the dairy or of the lumber company? *A.* I was an employee of the dairy.

"*Q.* Were you asked to go over there and work as an employee of the lumber company? *A.* No. . . .

"*Q.* When you went over to the lumberyard on June 5th to help move this conveyor, was it your intention to sever or cut off your relationship with the dairy as an employee? *A.* No, sir."

We do not consider that such quoted testimony is necessarily controlling of the issue, or that it gives rise to but one reasonable inference. This testimony is subject to the interpretation that the witness did not intend by going over to the lumber company's premises for fifteen or twenty minutes and helping move the conveyor he gave up his employment with the dairy company which carried with it the salary of $470 per month. If he had been called home by his wife to perform some temporary task at home, and had been asked the same questions with respect to that, as he was asked about the incident in question, he would undoubtedly have given the same answers.

As 1 Larson, Law of Workmen's Compensation, p. 712, sec. 48.10, points out, the consent to enter the employment of the special employer may be implied from the employee's acceptance of the special employer's control and direction. In the instant case Vernon, in helping move the conveyor, accepted the exercise of the control and direction of the project by his brother Warren, an executive of the lumber company. On this point the following questions were put to Vernon and he gave the following answers thereto:

"*Q.* He [Warren] generally was the person who was telling the rest of you what he wanted done on his property there, is that right? *A.* Yes.

"*Q.* He was telling the rest of you how to go about your work to accomplish what was to be done? *A.* That is right. . . .

"*Q.* As far as that specific job goes, at that time Warren was the man who had the right to control what was being done there? *A.* Yes. He was in charge of it. Yes."

However, the mere fact that a loaned employee submits himself to the control and direction of the special employer is not conclusive on the issue of such employee's implied consent to become the employee of the special employer. In a situation, where the original employer commands the loaned employee to perform service for the special employer, such right of control by the special employer standing alone is insufficient to support an inference that the employee impliedly consented to enter the employment of the special employer. *Rhinelander Paper Co. v. Industrial Comm.* (1931), 206 Wis. 215, 218, 239 N. W. 412. In Mr. Chief Justice ROSENBERRY's opinion in that case he declared (p. 217):

"Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is created. While the employee may be subject to the direction of the temporary master, he is there in obedience to the command of his employer, and in doing what the new master directs him to do he is performing his duty to the employer who gave the order."

See also *Boehck Equipment Co. v. Industrial Comm.* (1944), 246 Wis. 178, 188, 16 N. W. (2d) 298.

It, therefore, is crucial to the resolving of the instant appeal to determine whether Vernon, when he undertook to help out the lumber company in moving the conveyor, did so pursuant to a command of the original employer, the dairy company. If he did not, then the fact that he submitted to the control and directions of his brother Warren would support an inference of implied consent to become the lumber company's employee.

Vernon testified that he went over to the lumber company premises to move the conveyor because he was "told" by his brother Walter to do so, and that he regards Walter as his "immediate boss" at the dairy. However, Vernon was the vice-president of the dairy company and he also testified that Walter and he, as executives, had approximately the same

authority in operating that company. During the year prior to the accident, Vernon had gone over to the lumber company premises five or six times to temporarily help out. In elaborating on this he stated, "Whenever they [the lumber company] needed a little help I would give them a little help—that is, if I had the time." He was then asked these questions and gave these answers:

"*Q.* You were the one who would decide if you had the time? *A.* That is right.

"*Q.* No one forced you to go over there? *A.* No. Nobody forced me."

In view of the foregoing facts, the commission had the right to infer that Vernon did not go over to the lumberyard to move the conveyor because he was commanded to do so by any superior officer. It could conclude that Walter in asking Vernon to do so was merely acting in the capacity of a messenger conveying the message that the lumber company was requesting temporary assistance as it had in the past. It is a further reasonable inference based upon past practice that Vernon exercised his independent judgment in acceding to the request.

In the absence of any command from the original employer that Vernon assist the lumber company in moving the conveyor, we deem the fact, that the work being done at the time of the accident only benefited the special employer and not the original employer, also tends to support an inference of implied consent to enter the employment of the special employer. It is significant that in most of the cases decided by this court, in which it has been held that the loaned employee continued in the employ of the original employer, the original employer derived some benefit from the work being done for the special employer.[2]

---

[2] Typical of these cases are: *Braun v. Jewett* (1957), 1 Wis. (2d) 531, 85 N. W. (2d) 364; *Edwards v. Cutler-Hammer, Inc.* (1956), 272 Wis. 54, 74 N. W. (2d) 606; *Siblik v. Motor Trans-*

Once the hurdle of consent of Vernon to work for the special employer has been surmounted, there is no other obstacle which would prevent the commission from finding that he was the employee of the lumber company at the time he sustained his injury. This is because at the time of the accident Vernon was performing the work of the lumber company; the lumber company through its managing executive Warren Schinke had the right to control the details of moving the conveyor; and the work was for the primary benefit of such company.

While the determination of the commission, that Vernon was the employee of the lumber company at the time of the injury, must be sustained, this does not dispose of the appeal. This is because of a further issue raised by the appellants. Such issue is that there is no evidence in the record to sustain the finding of the commission that Vernon's weekly compensation rate for temporary total disability is $45.50.

port Co. (1952), 262 Wis. 242, 55 N. W. (2d) 8; *Hudson v. Industrial Comm.* (1942), 241 Wis. 476, 6 N. W. (2d) 217; *Rhinelander Paper Co. v. Industrial Comm.* (1931), 206 Wis. 215, 239 N. W. 412; *Hardware Mut. Casualty Co. v. Industrial Comm.* (1928), 197 Wis. 156, 221 N. W. 649; *Visiting Nurse Asso. v. Industrial Comm.* (1928), 195 Wis. 159, 217 N. W. 646. Uniformly where the original employer has leased a truck, other piece of equipment, or a team, to the special employer, together with an employee to operate or drive the leased property, such employee has been held to have continued in the employ of the original employer: *Hanz v. Industrial Comm.* (1959), 7 Wis. (2d) 314, 96 N. W. (2d) 533; *Boehck Equipment Co. v. Industrial Comm.* (1944), 246 Wis. 178, 16 N. W. (2d) 298; *Hoefer v. Last* (1936), 221 Wis. 102, 266 N. W. 196; *Packard v. Industrial Comm.* (1933), 213 Wis. 1, 250 N. W. 768; *De Forest Dairy Co. v. Friedrich* (1930), 202 Wis. 251, 232 N. W. 543; *Wagner v. Larsen* (1921), 174 Wis. 26, 182 N. W. 336. In these latter cases, also, it could well be argued that the original employer has received a benefit from the services rendered by the loaned employee operator or driver, inasmuch as the original employer gains financially from the leasing arrangement and at the same time the care and operation of the leased property is intrusted to a person selected by himself.

Sec. 102.43 (1), Stats. 1955, provides for a weekly workmen's compensation benefit rate of 70 per cent of the average weekly earnings of the employee, subject to a maximum weekly wage of $65 per week as imposed by sec. 102.11 (1), Stats. 1955. In finding a benefit rate of $45.50 per week, it is obvious that the commission assumed average weekly earnings at least equal to such maximum. However, Vernon received no wages or salary from the lumber company and, therefore, had no actual average weekly earnings from such company upon which such benefit rate could be computed. In such a situation, sec. 102.11 (1) (c), Stats. 1955, provides "the earnings of the injured person shall, for the purpose of calculating compensation payable under this chapter, be taken to be the usual going earnings paid for similar services on a normal full-time basis in the same or similar employment."

Unfortunately, no testimony was adduced in the hearing before the examiner as to what was the going rate for manual labor in the community as of June 5, 1957. The necessity of such required proof was called to the attention of the examiner at the start of the hearing by counsel for the appellants. Furthermore, the appellants in their complaint in the circuit court attacked the finding of a $45.50 benefit rate. The fact that Vernon was paid $470 per month as an executive of the dairy company is not relevant on the issue of the going wage for manual labor in Springfield and vicinity. It is obvious that an employer would not pay an executive's salary to an employee engaged to pile lumber or load or unload coal.

In some situations it may be proper for the commission to take judicial notice that the going rate of certain occupations in a particular locality equals or exceeds the statutory maximum specified in sec. 102.11 (1), Stats. 1955. However, this court is not in a position to take judicial notice that the going wage for manual labor in the rural hamlet

of Springfield, Wisconsin, was at least $65 per week in June, 1957. The attorney general's brief contends that the commission was entitled to take judicial notice that such was the fact because in 1957 the average weekly wage for all employees covered by the Workmen's Compensation Act was $80.84. Inasmuch as this covers employments of skilled workers in industry in urban communities, well-paid workers on highway-construction and improvement projects, and such highly paid craftsmen as plumbers, painters, carpenters, masons, electricians, etc., we deem such statistic is inadequate to support the instant finding.

It is our conclusion that the cause must be remanded to the commission to make a finding as to the going wage rate for manual labor in Springfield and vicinity in June, 1957.

*By the Court.*—Judgment reversed, and cause remanded with directions to set aside the interlocutory order of the commission and the finding of fact which established the benefit rate, and to remand the proceedings to the Industrial Commission for further proceedings not inconsistent with this opinion.