Terrence A. BORNEMAN, as surviving spouse of Jason S. Borneman, deceased, Plaintiff-Appellant,

v.

CORWYN TRANSPORT, LTD., Great West Casualty Company and Employers Insurance of Wausau, a mutual company, Defendants-Respondents.†

Court of Appeals

*No. 96–2511. Submitted on briefs March 4, 1997.—Decided June 3, 1997.*

(Also reported in 567 N.W.2d 887.)

† Petition to review granted.

26

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Randy L. Frokjer* of *Ament, Wulf & Frokjer* of Merrill.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Jeffrey J. Strande* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

Before LaRocque, Myse and Mangerson,[1] JJ.

MANGERSON, J.   Terrence A. Borneman is the surviving spouse of Jason S. Borneman, who was killed at his place of employment, Major Industries, Inc., when a load of aluminum extrusions fell upon him from a flatbed trailer during loading. Borneman commenced an action against Corwyn Transport, Ltd., and its

---

[1] Circuit Judge Mark A. Mangerson is sitting by special assignment pursuant to the Judicial Exchange Program.

insurer based on the alleged causal negligence of its driver, Monty Szydel, who was assisting with the loading at the time of the mishap. The trial court granted summary judgment, dismissing Borneman's complaint on the finding that, at the time of the accident, Szydel was an employee who had been loaned by Corwyn to Major, making him a co-worker of Borneman and precluding Borneman from recovery against him and Corwyn, pursuant to § 102.03(2), STATS.[2] Borneman now appeals the judgment.

Borneman contends that the trial court erred when it found as a matter of law that Szydel had been loaned by Corwyn to Major at the time of Borneman's demise. Borneman asserts there was no loaned employee relationship between Szydel and Major. In the alternative, Borneman asserts that summary judgment is precluded because there are material facts at issue from which a jury could reasonably infer that Szydel was not a loaned employee, but remained an employee of Corwyn. We conclude, as a matter of law, the facts are insufficient to support the loaned employee defense, and granting summary judgment to Corwyn was inappropriate. We therefore reverse the

---

[2] Section 102.03(1), STATS., lists the conditions under which an employer shall be liable for worker's compensation. Pursuant to § 102.03(2):

> Where such conditions exist the right to recovery of [worker's] compensation under this chapter shall be the exclusive remedy against the employer, any other employe of the same employer and the worker's compensation insurance carrier. This section does not limit the right of an employe to bring action against any coemploye for an assault intended to cause bodily harm, or against a coemploye for negligent operation of a motor vehicle not owned or leased by the employer, or against a coemploye of the same employer to the extent that there would be liability of a governmental unit to pay judgments against employes under a collective bargaining agreement or a local ordinance.

judgment, direct summary judgment precluding the loaned employee defense, and remand the case for trial on the issue of Szydel's negligence.

## STATEMENT OF THE FACTS

Corwyn Transport, Ltd., contracted with Major to haul a load of Major's product from Marathon County, Wisconsin, to Georgia. Szydel, a regular employee of Corwyn, left a semi-trailer at Major on the Friday before the accident. The trailer was to be loaded by Major employees and ready for pickup by Szydel the following Monday morning. Szydel expected to pick up the loaded trailer at 7 a.m. on Monday, but loading had been delayed because of inclement weather and when he arrived after 9 a.m., the trailer was still not loaded.

Douglas Bruesewitz, Major's foreman, began loading the trailer by placing various crates on the trailer with a forklift. The loading process typically required four workers, and Major had four workers present at the beginning of the loading process: Bruesewitz, Mark Sala, Michael Giovanoni, and Jason Borneman. However, shortly after Bruesewitz began loading, Szydel began helping. Nothing of record suggests that there was any arrangement between Corwyn and Major for him to do so. Nothing of record suggests that Bruesewitz or anyone on Major's behalf requested the assistance. There is a dispute as to why Szydel was helping. Some of Major's employees suggest that Szydel was in a hurry because of the loading delay, although Szydel denies this.

The load in question was a "double load," meaning that two loads to separate destinations were being placed on the same trailer, one to the front of the trailer and the other to the rear. Such a double load had not been loaded or shipped by Major in the past. There is a

29

dispute as to the significance of the double load. Borneman contends that the double load required unique placement of the cargo on the trailer bed; Corwyn contends that the loads were typical, merely being placed on different ends of the trailer.

There is a dispute about Szydel's role in the loading process. Mark Sala, an employee of Major, claims that Szydel was on top of the load immediately before it fell. Sala stated that Szydel was the person in the best position to determine the stability of the load. Michael Giovanoni, another employee of Major, testified that Szydel was "helping position the load," making suggestions as to where the boxes of extrusions should be placed. To the contrary, both Szydel and Bruesewitz claim that at no time did Szydel offer any direction whatsoever on the sequence, method or any other detail of the loading process.

There is no dispute that Bruesewitz was Major's foreman and was responsible for supervising the trailer loading. The parties also agree that neither Bruesewitz nor anyone else on behalf of Major requested Szydel's assistance. The clear inference from all facts of record is that management of neither Corwyn nor Major was aware of Szydel's assistance in the loading process.

Shortly before 1 p.m., Jason Borneman found himself balanced between the flatbed trailer and a cart which had been used to haul the boxes of extrusions to the trailer. There is some question as to why he was in that particular location. He was placing the last box or two of extrusions onto the load when part of the load, weighing in excess of one ton, fell upon him and tragically caused his death.

The trial court decided there was no genuine issue of material fact on the issue whether Szydel was an

employee who had been loaned by Corwyn to Major at the time of the accident. Using the test first set forth in *Seaman Body Corp. v. Industrial Comm'n*, 204 Wis. 157, 235 N.W. 433 (1931), the trial court ruled as a matter of law that Szydel had become a special employee of Major, effectively making him a co-employee of Borneman at the time of Borneman's death. According to the trial court, Borneman's exclusive remedy, therefore, became a worker's compensation claim against Major, his employer, under § 102.03(3), STATS., for his wrongful death, and no claim could be brought against Corwyn.

## STANDARD OF REVIEW

Under § 802.08(2), STATS., summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Our review of a summary judgment is governed by the standard articulated in § 802.08(2), and we are required to apply the standards set forth in the statute just as the trial court applied those standards. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987).

Summary judgment methodology prohibits the trial court from substituting itself for a jury; instead, the court must look for the absence of all genuine factual issues before summary judgment should be granted. *Rach v. Kleiber*, 123 Wis. 2d 473, 478–79, 367 N.W.2d 824, 827 (Ct. App. 1985). Where the evidence raises competing material facts or inferences, sum-

mary judgment should not be granted. *Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473, 477 (1980). All inferences from the evidence before the court are to be viewed in the light most favorable to the non-moving party, and any reasonable doubt as to the existence of any material fact is to be resolved against the moving party. *Id.* Where competing inferences arise and the credible evidence will support or deny either inference, it is for the trier of fact to draw the proper inference and not for the court to substitute its judgment summarily. *Fischer v. Mahlke,* 18 Wis. 2d 429, 435, 118 N.W.2d 935, 939 (1963).

## ANALYSIS

The trial court decided that Szydel was a loaned employee under the test originally set forth in *Seaman.* The *Seaman* test, first articulated by the supreme court in 1931, in its entirety, is as follows:

> The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.

> The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?

*Id.* at 163, 235 N.W. at 435–36. Although the "test" consists of concurrence of the three factors recited at phrases (a) through (c) above, the vast majority of cases have quoted and focused upon the "vital questions" as if they *were* the test. While all of the "vital questions" may help determine the ultimate question, none focuses upon the need for the employee to *enter upon the work* of the special employer *pursuant to* an expressed or implied *contract* to do so. In an attempt to answer the four "vital questions," we conclude, courts have sometimes lost the focus of the overall inquiry—to determine whether a new employment contract was created by the parties.

Because of this misfocus, the cases are often self-deprecating:

> This court, as well as others, has found the question of the "loaned employee" troublesome. The definition and factual essentials necessary to establish the legal relationship of the loaned employee are not uniform in all the reported cases, nor is the same emphasis always to the necessary elements.

*Huckstorf v. Vince L. Schneider Enter.*, 41 Wis. 2d 45, 49, 163 N.W.2d 190, 193 (1968) (citing *Springfield Lumber, Feed & Fuel Co. v. Industrial Comm'n*, 10 Wis. 2d 405, 102 N.W.2d 754 (1960)).

> The plaintiff argues that when the tests to determine whether a loaned servant becomes the servant of the borrowing master are applied to particular fact situations, the results are not predictable or consistent. We acknowledge that this criticism is well founded. We have said that while the tests or rule to determine whether a loaned employee retains employment with his original employer or becomes the employee of the borrowing employer

"are readily comprehensible, when applied to specific factual situations, the distinctions are sometimes slight and the decisions well-nigh irreconcilable."

*DePratt v. Sergio*, 102 Wis. 2d 141, 145–46, 306 N.W.2d 62, 64–65 (1981) (quoting *Freeman v. Krause Milling Co.*, 43 Wis. 2d 392, 394, 168 N.W.2d 599, 600 (1969)).

We respectfully suggest that courts use the three-element test of *Seaman* as it was originally stated, with a focus on whether a special employment contract has been created, considering not only the "vital questions" of *Seaman* in the inquiry, but all queries and inferences that assist in making that determination.

## A. Consent on the Part of the Employee to Work for a Special Employer

The consent element of the *Seaman* test is not so simplistic as to turn on the question whether the employee was willfully doing an act for the new employer; instead, the employee's consent should be considered from the bearing it has on the establishment of a new employment contract.[3]

---

[3] Corwyn cites *Meka v. Falk Corp.*, 102 Wis. 2d 148, 155–56, 306 N.W.2d 65, 70 (1981), to support its argument that an agreement or contract between the parties is not essential to create a loaned employee relationship. *Meka* is distinguishable for two reasons: an agreement or contract already existed between the regular employer and the special employer regarding the use of the worker, and the worker's regular employer was a temporary help agency. According to § 102.29(6), STATS., an addition to the Worker's Compensation Act enacted in response to *Meka* and other cases applying the *Seaman* test, "No employe of a temporary help agency who makes a claim for compensation may make a claim or maintain an action in tort against any employer who compensates the temporary help

> In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: Did he make a contract of hire with the special employer? If this question cannot be answered "yes," the investigation is closed, and there is no need to go on into tests of relative control and the like.

*Ryan, Inc. v. Industrial Comm'n*, 39 Wis. 2d 646, 650–51, 159 N.W.2d 594, 596 (1968) (quoting 1 LARSON, LAW OF WORKMEN'S COMPENSATION, § 48.10 at 10–11)). The issue is not whether the employee of the original employer consented to do some temporary, isolated acts for the benefit of another employer, but whether that employee desired and consented to a new, superseding working relationship.

> There is an important distinction between the mere consent of an employee to perform certain acts on behalf of or for the benefit of the special employer and the consent to leave his employment and enter into a new employer-employee relationship, of even a temporary nature.

*Escher v. Industrial Comm'n*, 39 Wis. 2d 527, 533, 159 N.W.2d 715, 718 (1968).

The employee's consent can be inferred from his words and acts bearing on his intent. In the case at bar, neither party can explain why Szydel began helping Major's employees with the loading. There is no evidence of record that he was specifically asked by the foreman, Bruesewitz, or others to help. There is also no evidence to suggest that Major's employees relented

agency for the employe's services." *Gansch v. Nekoosa Papers, Inc.*, 158 Wis. 2d 743, 748, 463 N.W.2d 682, 684 (1990). With respect to employees of a temporary help agency, § 102.29(6) replaced *Seaman*'s loaned employee test. *Bauernfeind v. Zell*, 190 Wis. 2d 701, 712, 528 N.W.2d 1, 5 (1995).

and allowed Szydel to help at his insistence. The record supports only the inference that Szydel started assisting Major's employees and, because there was no objection, he continued to do so. We conclude that such casual cooperation alone does not rise to the level of establishing a new employer-employee relationship between Szydel and Major Industries.

Additionally, other traditional indicia of a new contract were missing. There was no new consideration. Szydel was not receiving anything "extra" from Major for his help. His assistance would logically benefit both Corwyn and Major. He could make two more-timely deliveries if the load were on the trailer sooner. Corwyn and Major both had contracts for the delivery of the aluminum extrusions to third parties.

Finally, we are not inclined to recognize as a matter of law the establishment of a new contract between Corwyn's employee, Szydel, and Major Industries where there is no evidence that the management of either Corwyn or Major consented or even had knowledge of the relative actions of their employees at the time of the accident. Knowledge of the two employers certainly has a bearing on the establishment of any new, temporary contractual relationship. As alleged in Borneman's brief, in virtually every reported "loaned employee" case, the general employer knew of and consented in advance to the change of employer-employee relationship.[4]

---

[4] *See Bauernfeind v. Zell*, 190 Wis. 2d 701, 528 N.W.2d 1 (1995); *Meka v. Falk Corp.*, 102 Wis. 2d 148, 306 N.W.2d 65 (1981); *Skornia v. Highway Pavers, Inc.*, 39 Wis. 2d 293, 159 N.W.2d 76 (1968); *Escher v. Industrial Comm'n*, 39 Wis. 2d 527, 159 N.W.2d 715 (1968); *Gant v. Industrial Comm'n*, 263 Wis. 64, 56 N.W.2d 525 (1953); *Combustion Eng'g Co. v. Industrial Comm'n*, 254 Wis. 167, 35 N.W.2d 317 (1948); *Rhinelander*

Szydel's efforts to assist Major's employees with the loading, without invitation and for no remuneration from Major, permit the inference that he acted as a volunteer, as opposed to a person engaging in a new employment contract. When the employee of a general employer assists others as a true volunteer, he or she does not become a loaned employee under a special employment contract. Something more is required to ripen a volunteer's conduct into a contractual relationship. *See Enderby v. Industrial Comm'n,* 12 Wis. 2d 91, 95, 106 N.W.2d 315, 317 (1960); *Bituminous Cas. Co. v. Industrial Comm'n,* 245 Wis. 337, 340–41, 13 N.W.2d 925, 926 (1944); *Kammler v. Industrial Comm'n,* 233 Wis. 173, 175–76, 288 N.W. 778, 779 (1939); *Village of West Milwaukee v. Industrial Comm'n,* 216 Wis. 29, 34, 255 N.W. 728, 730 (1934).

In its bench decision, the circuit court relied principally on the holding of *Springfield,* which it concluded was "basically the mirror of our case." However, *Springfield's* facts are unique. Springfield Lumber, Feed and Fuel Co. and Charles F. Schinke Dairy, Inc., were two corporations whose stock was wholly owned by members of the Schinke family. *Id.* at 406–07, 102 N.W.2d at 756. Vernon Schinke owned substantial stock in the dairy company and was its officer and director, and owned only one share of stock in the lumber company to qualify him as a director. Vernon's brother, Walter, was an officer and manager of the dairy company and another brother, Warren, was an officer and manager of the lumber company. Vernon was injured when he helped Walter, on Walter's request and at Warren's direction, move a coal con-

*Paper Co. v. Industrial Comm'n,* 206 Wis. 215, 239 N.W. 412 (1931).

veyor at the lumber company. *Id.* at 407, 102 N.W.2d at 756.

Vernon filed a claim for worker's compensation with the Industrial Commission against both the dairy company and the lumber company. The commission awarded worker's compensation to Vernon, and the circuit court affirmed. *Id.* at 414, 102 N.W.2d at 760. The supreme court in *Springfield*, citing *Seaman* and its test (or, rather, the "vital questions") decided that the commission had the right to infer that Schinke was an employee of the lumber company at the time of the accident, despite his testimony to the contrary. Furthermore, the supreme court decided the finding of the commission was bolstered by the fact that Vernon, in helping move the conveyor, accepted the exercise of the control and direction of the project by his brother, Warren, an executive of the lumber company. Most importantly, the court decided the facts supported the inference that Walter had asked Vernon to assist on behalf of the lumber company and Vernon had agreed to do so, exercising his independent judgment as an officer, shareholder and employee of the dairy company. *Id.* at 413, 102 N.W.2d at 759.

The element of knowledge and consent of the respective two employers to the employee transition is implicit in the *Springfield* decision. *Id.* at 413, 102 N.W.2d at 759. Additionally, the supreme court recognized that, at the time the work was performed, it was solely for the benefit of the lumber company, with the dairy company not benefiting whatsoever. *Id.* at 414, 102 N.W.2d at 760.

Here, the trial court placed undue reliance on the *Springfield* case. First, the underlying facts are clearly distinguishable. None of the parties or employees in the case at bar were contemporaneously acting as

employers who were making decisions on loaning an employee from one company to another. There is no indication that anyone on behalf of Major was directing the work with Szydel clearly submitting to that authority, and there is no established past practice to inspire Szydel to again perform duties for Major.

Second, the manner in which the *Springfield* case was used by the trial court assumes that the volunteer status of an employee who helps a second employer militates in favor of a finding that the employee was, in fact, "loaned" by the original employer. As noted above, we conclude cases involving true volunteerism consider that factor to raise an inference against loaned employee status. *See Enderby; Bituminous Cas. Co.; Kammler; Village of West Milwaukee.* In that regard, *Springfield* is not truly a "volunteer" case at all.

Finally, *Springfield* was a case in which the court was clearly showing due deference to the findings of an administrative agency. As stated above, this court is reviewing the record presented without such deference to the trial court.

## B. Actual Entry by the Employee Upon the Work of and for the Special Employer Pursuant to an Express or Implied Contract to Do So

The second element of the *Seaman* test concerns the temporal relationship between the formation of the contract of special employment and the actual commencement of work. It anticipates that the employee will first commence work after the contract has been established. This conclusion is compelled by the fact that all four of the cases upon which the *Seaman* court relied to establish the test involved situations in which the regular employer and the special employer had a prior agreement for the loaning of an employee. *See*

*Spodick v. Nash Motor Co.*, 203 Wis. 211, 232 N.W. 870 (1930); *Visiting Nurses' Ass'n v. Industrial Comm'n,* 195 Wis. 159, 217 N.W. 646 (1928); *Powell v. Industrial Comm'n,* 193 Wis. 38, 213 N.W. 651 (1927); and *Cayll v. Industrial Comm'n,* 172 Wis. 554, 179 N.W. 771 (1920). And, as noted above, the vast majority of reported worker's compensation cases rest on such prior arrangements.

Corwyn argues that an employment contract between Szydel and Major should be implied from the mere fact that Szydel worked with Major employees in an apparent common cause. We question the logic that a contract can arise, even by implication, through casual, uncompensated performance as occurred here. The respective rights and duties of the employer and employee are not definable in such a situation. We think there is great value in holding that a contract for the employment of the loaned employee must exist before the employee commences work, as *Seaman* anticipated.

Subsumed in this second element of *Seaman* are two of the traditional "vital questions": Whose was the work the employee was performing at the time of the injury? And for whose benefit primarily was that work being done? There is no dispute Major's employees were responsible for loading the trailer and Szydel was responsible for securing the load and driving it to the customers. However, it cannot clearly be determined from the facts that Szydel's work at the time of the accident was work exclusively "of and for" Major Industries. Certainly, proper placement of the load on the flatbed was intimately related to Szydel's ability to strap and secure the load, to his benefit and Corwyn's. Furthermore, if Szydel assisted in the loading process, presumably he would be on the road sooner, preventing

delay in performance of Corwyn's contract and freeing himself and his rig for other work.

### C. Power of the Special Employer to Control the Details of the Work to be Performed and to Determine How the Work Shall be Done and Whether it Shall Stop or Continue

The third element of the *Seaman* test concerns control of the job. Both parties to this action argued extensively before the trial court and in briefs submitted on appeal as to who was controlling the loading process at the time of the accident. There is considerable contradiction in that regard. Borneman cites the testimony of Mark Sala, an employee of Major, that Szydel was on top of the load at the time of the accident, in the best position to determine the stability of the load, and was actually directing positioning of the load. The testimony of Mike Giavononi, another Major employee, corroborates this. Presumably, Borneman is advancing the theory that Szydel was as much in control of the loading process as anyone and, therefore, had not become a special employee of Major.

Corwyn asserts that Major's foreman, Bruesewitz, was solely responsible for the loading operation. He was completely directing the loading process, and Szydel had no right to take any steps to change or modify that process. Corwyn alleges, and the trial court found, that Szydel's participation was limited to "tidying" the load like a person would reposition furniture that had already been brought into a room.

Both parties have missed the point in regard to the third element of the *Seaman* test. Again, this element must be analyzed with respect to the relative *contract* rights and duties at the time of the accident. *See Lange v. DILHR,* 40 Wis. 2d 618, 624–25, 162 N.W.2d 645,

649 (1968). "The cases cited by plaintiff relating to the question of right to control details of employment assume some type of contractual relationship between the parties involved, express or implied, as the frame of reference in which right of control becomes a material factor to be evaluated." *Id.*

In *Gansch v. Nekoosa Papers, Inc.*, 158 Wis. 2d 743, 463 N.W.2d 682 (1990), the supreme court explained quite clearly that the element of the *Seaman* test dealing with "control" concerns the authority of the employer to direct the work of the specific employee, as opposed to the employer's general control of the work activity. In *Gansch*, the court was concerned with issues not relevant here: tort liability under § 102.29(6), STATS., 1985–86, and the liability of a "temporary help agency" under § 102.01(2)(f), STATS. However, the language of the supreme court is compelling:

> The statutory formulation of the control requirement [relating only to "temporary help agencies"] differs from the *Seaman* formulation of the control component. *Seaman* provided that for the borrowing employer to become the loaned employee's employer the borrowing employer must have "the right to control the details of the work being performed." The statute merely requires that the temporary employer "control the work activities" of the temporary employee. The control requirement for the temporary employer appears to be less stringent in the statute than in the *Seaman* test. The statute does not require the temporary employer to control or have the right to control the details of the work being performed. Under the statutory language the temporary employer need not have exclusive control over the temporary employee's work. Under the statutory formulation

of the control requirement, the temporary employer need only control the work activities of the temporary employee.

*Gansch,* 158 Wis. 2d at 752–53, 463 N.W.2d at 685–86 (citation omitted; footnote omitted).

The debate between Borneman and Corwyn in trial court briefs, on oral argument before the circuit court and in briefs on appeal, focused upon the actual work activities of Major's foreman, laborers and Szydel during the loading. Some facts tend to show that Bruesewitz was in control of the loading activity and Szydel's participation was minimal. Other facts tend to show that Szydel was in control of placement of the load at the time of the tragedy. However, there is nothing of record which suggests that Bruesewitz had any authority over Szydel; that is, the *right* to control Szydel's activities. It must be remembered that, as noted in detail above, the vast majority of "loaned employee" cases involve a prior, specific agreement between two employers for the transfer of one employee from the employ of the first to the second, together with the right to direct, discipline or discharge that employee. We see no evidence of such a contractual arrangement here.

We note that Borneman on appeal, and the trial court in its bench decision, failed to reference a well-established presumption relevant to the control element of the *Seaman* test. In *Braun v. Jewett,* 1 Wis. 2d 531, 538, 85 N.W.2d 364, 368 (1957), and again in *Skornia v. Highway Pavers, Inc.,* 39 Wis. 2d 293, 299–300, 159 N.W.2d 76, 80 (1968), the supreme court adopted the rule as it appears in RESTATEMENT (SECOND) OF AGENCY § 227 cmt. b, at 501 (1958):

In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it.

This inference has risen to the level of a legal presumption in more recent cases. *See Freeman*, 43 Wis. 2d at 394, 168 N.W.2d at 600; *Huckstorf*, 41 Wis. 2d at 50, 163 N.W.2d at 193. It is incumbent upon the general employer attempting to avoid liability under worker's compensation law to overcome this presumption:

As employer it would ordinarily be liable for the act of its servant under the doctrine of *respondeat superior* because of its superior control over its subordinate. "If he can show that he has loaned the servant to another and surrendered to the borrower all direction and control over him, then the borrower becomes the master, who is alone liable for the acts of the servant. But the burden is upon the general employer to establish not only that he loaned the servant but that he surrendered control and direction over the servant to the borrower." The presumption is, then, that the employee is under the control and direction of the general employer. The general employer may rebut that presumption by showing that he relinquished full control of his employee.

*Edwards v. Cutler Hammer, Inc.*, 272 Wis. 54, 64, 74 N.W.2d 606, 611 (1956) (citation omitted).

■ We conclude the facts of record are insufficient to overcome this presumption. Corwyn has not met its burden. Casual, unplanned, uninvited participation by

Szydel in the loading of Major's product on Corwyn's truck represents a minor deviation from the usual tasks performed for his regular employer and not a shifting of control over Szydel from Corwyn to Major Industries.

## CONCLUSION

We conclude as a matter of law that Szydel was not an employee loaned by Corwyn to Major because Szydel did not consent to establish a new employment contract with Major Industries immediately prior to the fatal accident, did not enter upon a special employment contract to do work "of and for" Major Industries, and did not participate in the loading of the truck under Major's control. We recognize there is a factual dispute about Szydel's role in the loading process. However, when we examine all of the relevant evidence, it does not present a genuine issue of material fact, and is insufficient to support Corwyn's loaned employee defense. Therefore, we reverse the judgment and remand with directions that the trial court enter summary judgment precluding the loaned employee defense and set the matter for a trial on the issue of Szydel's negligence.

*By the Court.*—Judgment reversed and cause remanded for further proceedings consistent with this opinion.