COURT OF APPEALS
DECISION
DATED AND FILED

August 27, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP826**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV1014

IN COURT OF APPEALS
DISTRICT III

MARK DEMARS,

PLAINTIFF-APPELLANT,

ACCIDENT FUND GENERAL INSURANCE COMPANY OF AMERICA AND ACCIDENT FUND HOLDINGS, INC.,

INVOLUNTARY-PLAINTIFFS,

V.

FINCANTIERI MARINE GROUP, LLC AND MARINETTE MARINE CORPORATION,

DEFENDANTS-RESPONDENTS,

STARR INSURANCE HOLDINGS, INC. D/B/A STARR INDEMNITY AND LIABILITY COMPANY,

DEFENDANT-THIRD-PARTY PLAINTIFF-RESPONDENT,

V.

BOSK CORPORATION AND AUTO-OWNERS INSURANCE GROUP D/B/A HOME-OWNERS INSURANCE COMPANY,

THIRD-PARTY DEFENDANTS-RESPONDENTS.

APPEAL from an order of the circuit court for Brown County: THOMAS J. WALSH, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 STARK, P.J. This case addresses the negligence claims of a "loaned employee" against his borrowing employer under WIS. STAT. § 102.29(7) (2021-22)[1] of Wisconsin's Worker's Compensation Act (the Act). Mark Demars appeals from the circuit court's grant of summary judgment to third-party defendants Bosk Corporation—which is Demars' employer—and Auto-Owners Insurance Group d/b/a Home-Owners Insurance Company (collectively, Bosk) and from the court's dismissal of Demars' claims against Fincantieri Marine Group, LLC—which is the borrowing employer—and Marinette Marine Corporation.[2] Demars was injured while he was working at FMG's premises. Demars applied for and received worker's compensation benefits from Bosk, but he also filed this lawsuit solely against FMG. Pursuant to an indemnification agreement, FMG filed a third-party complaint against Bosk.

¶2 Bosk and FMG filed motions for summary judgment. The circuit court granted Bosk's motion for summary judgment based on its conclusion that Demars was a loaned employee under WIS. STAT. § 102.29(7)—which we will

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Marinette Marine Corporation is a subsidiary of Fincantieri Marine Group, LLC, and the owner of the premises. Starr Insurance Holdings, Inc. d/b/a Starr Indemnity Corporation is their insurer. We will refer to these parties collectively as "FMG."

refer to as "the loaned employee doctrine"—and, therefore, his suit against FMG was barred under the Act.

¶3 On appeal, Demars asserts three reasons the circuit court erred by granting summary judgment to Bosk: (1) Bosk, not FMG, asserted the loaned employee doctrine as an affirmative defense, and, therefore, FMG is barred from asserting it; (2) the court's conclusion that Bosk was required to indemnify FMG was contrary to its conclusion that the loaned employee doctrine applied; and (3) Demars was not a loaned employee under WIS. STAT. § 102.29(7). For the reasons that follow, we reject all of Demars' arguments, and we affirm the court's decision.

## BACKGROUND

¶4 In this case, neither the circumstances of Demars' injury nor the details of FMG's alleged errors or omissions are relevant to the issues on appeal. It is sufficient for us to note that Demars suffered an industrial workplace injury on the premises of FMG in Marinette, Wisconsin, on June 19, 2018. At the time, Demars was employed by Bosk[3] as a painter, and Bosk had contracted with FMG to provide paint laborers to work on a littoral combat ship (hereinafter, LCS project) in furtherance of FMG's shipbuilding contract with the federal government. As a result of his injury, Demars filed a worker's compensation claim with Bosk, and "[i]ndemnity and medical payments were issued."

---

[3] The president and CEO of Bosk explained by affidavit that "Bosk Corporation is an industrial and commercial painting, coating and sandblasting company that has provided these services in schools, hospitals, papermills, powerplants, mines, and various other settings."

¶5 Demars also initiated this tort action against FMG, claiming FMG had violated Wisconsin's Safe Place statute under WIS. STAT. § 101.11, the "common law duty to provide a safe workplace and safe place of employment," and was otherwise variously negligent.[4] Upon receipt of Demars' complaint, FMG attempted to tender a defense to Bosk based on the terms and conditions of a purchase order agreement (the agreement) between FMG and Bosk. Within the agreement, Bosk had "agreed to provide labor and services to FMG … in connection with the painting of a certain vessel described as LCS-19." FMG alleged that Bosk had also agreed to defend and indemnify FMG against Demars' claims. Bosk failed to respond to FMG's tender of defense.

¶6 As a result, FMG filed a third-party complaint against Bosk, alleging contractual indemnity and breach of contract. Bosk, in its answer, denied all allegations regarding its duty to defend and indemnify FMG for Demars' injuries.

¶7 Bosk subsequently filed a motion for summary judgment, seeking dismissal of Demars' action on the basis of the loaned employee doctrine. On the same day, FMG also moved for summary judgment on two separate bases. FMG's first motion sought the dismissal of Demars' WIS. STAT. § 101.11 claim because Demars' "act of operation," rather than the acts of FMG, was "the efficient proximate cause of [his] injuries." In its second motion, FMG sought a declaration as to the validity of the indemnification agreement between it and Bosk, argued that Bosk had breached the terms of the indemnification agreement,

---

[4] Demars later filed an amended complaint, adding Marinette Marine Corporation and Starr Indemnity and Liability Company as defendants.

and claimed that Bosk "must reimburse FMG … for any defense costs incurred and to be incurred in defending FMG against [Demars'] claims."

¶8 By written decision, the circuit court first granted Bosk's motion for summary judgment. Relying on the test first established in *Seaman Body Corp. v. Industrial Commission of Wisconsin*, 204 Wis. 157, 235 N.W. 433 (1931), the court determined that Demars was a loaned employee because Demars consented to work for FMG; Demars was performing FMG's work; FMG had the right to, and did, control Demars' work; and FMG was the primary beneficiary of Demars' work. As a result, the court concluded that Demars' claims against FMG were barred under WIS. STAT. § 102.29(7).

¶9 Bosk then filed a proposed order in accordance with the circuit court's decision. The proposed order granted Bosk's motion for summary judgment; dismissed all of Demars' claims and causes of action "on the merits, with prejudice, and with statutory costs [and] attorneys fees"; and stated that "[b]ecause this [o]rder disposes of the entire matter in litigation as to … Demars, it is a final [o]rder for purposes of appeal as it relates to" Demars.

¶10 Demars objected to the proposed order and moved for clarification and/or reconsideration. According to Demars, FMG could not "avail itself of the [circuit c]ourt's [o]rder granting summary judgment to Bosk … because [FMG] never asserted the loaned employee doctrine as a defense to [Demars'] claims"; therefore, FMG had "waived" this defense and "any judgment granted to Bosk has no impact on [Demars'] claims against [FMG]." Demars also, for the first time, argued that the indemnification agreement between Bosk and FMG "waived [Bosk's] worker's compensation immunity" and that Demars' claims should survive, regardless of his status as a loaned employee.

5

¶11    The circuit court later entered a written decision on FMG's motion for summary judgment seeking a declaration as to the validity of the indemnification agreement.  The court granted the motion in part and denied it in part.[5]  As relevant here, the court determined that a valid indemnification agreement existed between Bosk and FMG and that "Bosk was in breach of the purchase order's binding indemnification provision when it failed to" accept FMG's tender of defense.  However, the court denied FMG's motion for a judgment for attorney's fees "because there ha[d] been no apportionment of liability."[6]

¶12    The same day the circuit court issued its decision on FMG's motion for summary judgment, it also held a status conference.  At that hearing, the court informed the parties that it would issue a written decision clarifying its prior decision on the loaned employee doctrine.  That written decision confirmed that "dismissal of Demars' claims is the correct result."  Demars appeals.

## DISCUSSION

¶13    This case involves the operation of the loaned employee doctrine under WIS. STAT. § 102.29(7).  Section 102.29(7) provides: "No employee who is loaned by his or her employer to another employer and who has the right to make

---

[5] It appears that the circuit court did not directly issue a decision on FMG's first motion for summary judgment, which sought dismissal of Demars' WIS. STAT. § 101.11 claim, because the court had already granted Bosk's summary judgment motion and dismissed *all* of Demars' claims.

[6] The circuit court noted that based on its decision regarding the indemnification issue, the court was available to Bosk and FMG to pursue the indemnification matter to the extent the agreement allowed, which is why the case was not dismissed outright once the court dismissed Demars from the case.

a claim for compensation under this chapter may make a claim or maintain an action in tort against the employer who accepted the loaned employee's services." "The rationale of the loaned employee doctrine as it relates to worker's compensation is that an employee who is on loan to a borrowing employer becomes a loaned employee of the borrowing employer and should, for worker's compensation purposes, be treated as an employee of the borrowing employer."[7] *Borneman v. Corwyn Transp., Ltd.*, 219 Wis. 2d 346, 353, 580 N.W.2d 253 (1998). "The loaned employee doctrine is one way of promoting the compromises and policies underlying the Worker's Compensation Act." *Id.*

¶14    As noted, the circuit court granted summary judgment to Bosk. We review a circuit court's grant of summary judgment de novo by applying the same methodology as the circuit court. *1325 N. Van Buren, LLC v. T-3 Grp., Ltd.*, 2006 WI 94, ¶22, 293 Wis. 2d 410, 716 N.W.2d 822. Under that methodology, summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).

¶15    We acknowledge that there are facts in dispute, but none of the facts are material to the legal issue in this case. Where the material facts are undisputed, we determine whether an employee is a loaned employee de novo but benefiting from the circuit court's analysis. *See Bauernfeind v. Zell*, 190 Wis. 2d

---

[7] We note that the case law on the topic of the loaned employee doctrine uses both "borrowing employer" and "special employer" to describe what WIS. STAT. § 102.29(7) refers to as "the employer who accepted the loaned employee's services." In this decision, we will use both terms interchangeably.

702, 714, 528 N.W.2d 1 (1995) (citing *Gansch v. Nekoosa Papers, Inc.*, 158 Wis. 2d 743, 753, 463 N.W.2d 682 (1990)); *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶35, 319 Wis. 2d 1, 768 N.W.2d 615.

¶16    On appeal, Demars asserts three reasons the circuit court erred by granting summary judgment to Bosk.  First, he claims that the court erred by expanding the loaned employee doctrine's protections to FMG, despite FMG's failure to assert that doctrine as a defense to Demars' complaint.  Second, Demars argues that the court's conclusions that FMG was entitled to indemnification by Bosk and also entitled to the loaned employee defense were contradictory.  Third, Demars asserts that the court erred by concluding that he was a loaned employee and that WIS. STAT. § 102.29(7) applied to this action.  For the reasons that follow, we reject all of Demars' arguments.

## I.  FMG's Failure to Assert the Loaned Employee Doctrine

¶17    Demars first argues that the circuit court erred by "expand[ing]" Bosk's loaned employee doctrine defense to FMG "even though [FMG] has never asserted the loaned employee doctrine as a defense to" Demars' claims.  Thus, to the extent summary judgment was properly granted to Bosk, Demars claims the same should not apply to FMG because it "waived"[8] the defense by failing to assert it.

---

[8] We note that Demars is actually asserting a forfeiture argument and not a waiver argument.  *See State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612 ("[F]orfeiture is the failure to make the timely assertion of a right, [whereas] waiver is the intentional relinquishment or abandonment of a known right." (citation omitted)).

¶18     FMG responds that Demars did not argue that FMG forfeited the loaned employee defense until his motion for clarification and/or reconsideration, which was *after* the circuit court had granted Bosk's summary judgment motion. *See **Bauer v. Wisconsin Energy Corp.***, 2022 WI 11, ¶14, 400 Wis. 2d 592, 970 N.W.2d 243 ("[A] motion for reconsideration is not a vehicle for making new arguments or submitting new evidentiary materials [that could have been submitted earlier] after the court has decided a motion for summary judgment." (second alteration in original; citation omitted)).  Thus, FMG argues that Demars "has waived[9] *his* argument that FMG waived the loaned employee defense."  In the alternative, FMG claims that once the court determined that Demars was a loaned employee, it also determined that Demars' exclusive remedy was under the Act.  According to FMG, the court therefore lacked subject matter jurisdiction to further address Demars' claims.

¶19     We conclude that, under the circumstances of this case, FMG did not forfeit the loaned employee doctrine defense, and the circuit court did not err by dismissing Demars from this case when it granted summary judgment to Bosk.  Demars argues that FMG never asserted the loaned employee doctrine as an affirmative defense in response to Demars' complaint, amended complaint, or in its motions for summary judgment.  Generally, "affirmative defenses *shall* be raised in a responsive pleading."  ***Maple Grove Country Club Inc. v. Maple Grove Ests. Sanitary Dist.***, 2019 WI 43, ¶43, 386 Wis. 2d 425, 926 N.W.2d 184 (citing WIS. STAT. §§ 802.02(3), 802.06(2)).  Section "802.06(2) provides an exception to that general rule, which indicates that the ten enumerated defenses 'may at the

---

[9]  FMG's assertion is also properly defined as a forfeiture argument, not a waiver.

option of the pleader be made by motion.'" *Maple Grove*, 386 Wis. 2d 425, ¶43 (quoting § 802.06(2)(a)).

¶20 As FMG argues, however, Demars fails to cite any relevant legal authority stating that the loaned employee doctrine is an affirmative defense that must be raised or else it is forfeited. Demars merely assumes that to be true. FMG does acknowledge that "immunity" is one of the enumerated affirmative defenses under WIS. STAT. § 802.02(3) and that the loaned employee doctrine is called a form of statutory "immunity." *See, e.g.*, *Bauernfeind*, 190 Wis. 2d at 713; *Gansch*, 158 Wis. 2d at 752. Regardless, we need not reach this issue because the record reveals that FMG *did* raise "all of the affirmative defenses contained in § 802.02" in its answer to Demars' amended complaint. Further, as we noted above, Bosk also responded to FMG's third-party complaint by stating that it was "entitled to the protections of WIS. STAT. § 102.29, including but not limited to, its exclusive remedy provisions" and further stated that "[f]or purposes of avoiding [forfeiture], [Bosk] incorporates the affirmative defenses set forth in … § 802.02." Thus, FMG and Bosk pled these defenses, and the loaned employee doctrine defense was not forfeited.

¶21 We also agree with the circuit court's rationale for why it concluded that the loaned employee doctrine defense did not apply only to Bosk. According to the court, "Bosk's position was crystal clear from the start—that Demars was a loaned employee of [FMG] and he was therefore statutorily barred from asserting any tort claims against [FMG] because his exclusive remedy was the worker's compensation claim he already received." The court noted that "Demars immediately went to work challenging Bosk's loaned-employee theory by pointedly deposing Bosk and [FMG] employees concerning facts relevant to the elements of the loaned employee doctrine and then thoroughly briefing the

matter"; thus, Demars was well aware of, and had ample opportunity to respond to, the defense. Ultimately, the court "d[id] not see how the loaned employee ruling c[ould] be compartmentalized" and not applied to Demars' claims against FMG in this matter. We agree.

¶22 Based on the plain language of WIS. STAT. § 102.29(7), Demars could not maintain his claims against FMG once he was determined to be a loaned employee. Essentially, once a court determines that an employee is a loaned employee and that he or she "has the right to make a claim for compensation under" the Act, § 102.29(7) provides that "[n]o [loaned] employee … may make a claim or maintain an action in tort *against the employer who accepted the loaned employee's services*." Sec. 102.29(7) (emphasis added). Thus, § 102.29(7) speaks directly to Demars' claims *against FMG*.

¶23 There is no dispute that Demars previously filed a worker's compensation claim against Bosk, and he was paid. The circuit court then determined that Demars was a loaned employee whose services were loaned to FMG. Therefore, WIS. STAT. § 102.29(7) specifically prohibits Demars from "mak[ing] a claim or maintain[ing] an action in tort against" FMG, as "the employer who accepted the loaned employee's services." *See* § 102.09(7). The conclusion that Demars was a loaned employee subject to § 102.29(7), regardless of which party raised the argument, bars his tort action against FMG, and the court properly dismissed Demars' claims.

## II. Contradictory Rulings

¶24 Demars next argues that the circuit court's "finding that Demars was a loaned employee[] is contradicted by the … court's finding that [FMG] was

11

entitled to indemnification."[10]  According to Demars, Bosk "waived its immunity" under the Act "when it entered [into] the indemnification agreement with [FMG]."

¶25    Generally, in Wisconsin, an employer cannot be liable to an injured employee beyond the liability imposed by the Act.  WIS. STAT. § 102.03. Wisconsin courts have determined, however, that an employer can waive this immunity if the employer agrees to indemnify a third party for tort claims an employee has against that third party.  *See* ***Schaub v. West Bend Mut.***, 195 Wis. 2d 181, 183, 185, 536 N.W.2d 123 (Ct. App. 1995).  Demars relies heavily on ***Schaub*** in support of his position.  There, the plaintiff, who was injured on a construction project, was an employee of a subcontractor.  ***Id.*** at 183.  The plaintiff received worker's compensation benefits and then filed a negligence action against the general contractor.  ***Id.***  The general contractor filed a third-party complaint against the subcontractor based on an indemnification and insurance paragraph in the contract between them.  ***Id.*** at 184.  The circuit court concluded that because the indemnification agreement did not specifically waive the subcontractor's immunity from suit under the Act, the agreement "had no force and effect" in the plaintiff's action.  ***Id.***  We reversed.  ***Id.*** at 183.

¶26    Thus, ***Schaub*** undeniably stands for the proposition that employers may waive immunity from lawsuits under the Act, and they may do so by agreeing to indemnify a third party for claims the injured employee has against that third

---

[10] As noted above, the circuit court determined that a valid indemnification agreement existed between Bosk and FMG and that "Bosk was in breach of the purchase order's binding indemnification provision when it failed to [accept FMG's] tender the defense of this case." Neither Bosk nor FMG dispute the court's conclusions on that issue.

party. *Id.* at 183, 185. Further, "Wisconsin law does not require the use of specific phrases … in order to give up immunity." *Id.* at 183.

¶27 *Schaub* relied on *Larsen v. J. I. Case Co.*, 37 Wis. 2d 516, 155 N.W.2d 666 (1968), and *Mulder v. Acme-Cleveland Corp.*, 95 Wis. 2d 173, 290 N.W.2d 276 (1980), which Demars also cites to support his position. Demars cites these cases for the general proposition that "the rule of no liability of the employer over and above that imposed by the Workmen's Compensation Act does not apply in the case of an express agreement for indemnification." *See Schaub*, 195 Wis. 2d at 185 (quoting *Larsen*, 37 Wis. 2d at 520); *see also Mulder*, 95 Wis. 2d at 177-78 (reasoning that action between third parties and employer for indemnification is barred, "absent a specific and express agreement").

¶28 Under the circumstances of this case, we conclude that the valid indemnification agreement between Bosk and FMG does not contradict the circuit court's conclusion that Demars was a loaned employee. In general, Demars reads the above cases too broadly. For example, in *Schaub*, at no point in the decision did this court mention or discuss the loaned employee doctrine. As the circuit court explained, *Schaub* is inapplicable to the case at hand because "in *Schaub* the loaned employee doctrine was not litigated and the validity of the plaintiff's claims against the general contractor was never questioned." *Larsen* and *Mulder*, too, exclusively address indemnification agreements in the context of third-party liability, not the loaned employee doctrine. *See generally Larsen*, 37 Wis. 2d 516; *Mulder*, 95 Wis. 2d 173.

¶29 We agree with the circuit court's discussion highlighting the difference between these situations:

> There is an inherent difference between the situation of a general contractor being sued by an employee of a

13

> sub-contractor that is obligated to indemnify the general contractor and the situation of a loaned employee suing the company he was loaned to even if the loaning company has an agreement to indemnify. In the former case the general contractor is a third party to the claimant whereas in the latter case the company to whom the employee was loaned stands in the shoes of the employer.

Similarly, we agree with Bosk that, under *Schaub*, it may have been required to indemnify FMG for Demars' damages were it not for the court's determination that Demars was a loaned employee. Under the facts here, however, because of Demars' status as a loaned employee, FMG is not a traditional third party under the Act, and Demars' claims against it are barred. Thus, Bosk has essentially agreed to indemnify FMG against a barred claim; Bosk did not waive immunity under the Act.

¶30 According to Demars, however, the circuit court, FMG, and Bosk all "overlook the fact that an enforceable indemnification agreement waives worker's compensation immunity, which by definition includes defenses based on [the] loaned employee" doctrine. In support of this statement, however, Demars again cites *Schaub* and *Larsen*. Beyond Demars' repeated, conclusory assertions that *Schaub*'s holding applies in this case and that worker's compensation immunity as it relates to an indemnification agreement "by definition includes" the loaned employee doctrine, Demars does not cite any legal authority in support of his position.[11] *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be

---

[11] Demars also cites *Ehr v. West Bend Mutual Insurance Co.*, 2018 WI App 14, ¶¶15-17, 380 Wis. 2d 138, 908 N.W.2d 486, and *Gansch v. Nekoosa Papers, Inc.*, 158 Wis. 2d 743, 463 N.W.2d 682 (1990), which he claims "have also recognized that considerations of the loaned employee defense are to be analyzed within the exclusive remedy provision of WIS. STAT. § 102.03." But while these cases *do* address the loaned employee doctrine, they do not assert that an enforceable indemnification agreement negates WIS. STAT. § 102.29(7).

considered."). To the extent that Demars either fails to recognize the differences between the factual circumstances or fails to develop his argument that *Schaub*'s holding does or should apply (and why), we conclude that Demars has failed to demonstrate that the court erred.

¶31 In summary, we agree with FMG that the indemnification agreement "does not deprive Bosk of its ability to rely on a loaned employee defense, and [it] certainly does not deprive FMG of that defense where FMG has not waived anything simply by accepting an indemnification from Bosk."

## III. Loaned Employee

¶32 We next determine whether Demars is properly considered a loaned employee under WIS. STAT. § 102.29(7).[12] The test to determine whether an

---

[12] We note that the Wisconsin Association for Justice (WAJ) filed an amicus curiae brief in this case. According to WAJ, this case should be analyzed in light of this court's decision in ***Ehr***, which addressed tort claims by temporary employees against their temporary employers under WIS. STAT. § 102.29(6)(b)1. (2015-16). In ***Ehr***, the question was whether an employee of a temporary help agency who was injured in the course of his employment and who had not made a worker's compensation claim could bring a tort claim against his temporary employer. ***Ehr***, 380 Wis. 2d 138, ¶1. We concluded "that a temporary employee who has not made a claim for compensation under the Act is permitted to pursue a tort claim against his or her temporary employer." ***Id.***, ¶2. We also stated that "even if the employee at issue in this case is construed as a loaned employee, rather than a temporary employee, we still conclude the Act does not bar his [or her] estate's tort claims." ***Id.***

WAJ argues that Bosk "[c]learly … leased its employee … to FMG, and FMG controlled the work of Demars"; therefore, "Demars may or may not be a loaned employee, but his role definitely fits the definition of a [WIS. STAT.] § 102.01(2)(f) temporary employee." (Footnote omitted.) According to WAJ, "there is no meaningful difference between a temporary employee and a loaned employee." *But see **Bauernfeind v. Zell***, 190 Wis. 2d 701, 712, 528 N.W.2d 1 (1995) (stating that different tests apply to each). Based on these assertions, WAJ claims that because Demars did not assert a worker's compensation claim *against FMG*, he "should be free to make a tort claim against FMG under WIS. STAT. § 102.29(6)(b)1."

(continued)

15

employee becomes a loaned employee of the borrowing employer was first set forth in *Seaman*. Our supreme court has explained that "[t]he *Seaman* loaned employee test has two aspects: three elements and four vital questions." *Borneman*, 219 Wis. 2d at 353.

> The relation of employer and employee exists as between a special employer to whom an employee is loaned whenever the following facts concur: (a) Consent on the part of the employee to work for a special employer; (b) Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do; (c) Power of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue.
>
> The vital questions in controversies of this kind are: (1) Did the employee actually or impliedly consent to work for a special employer? (2) Whose was the work he [or she] was performing at the time of injury? (3) Whose was the right to control the details of the work being performed? (4) For whose benefit primarily was the work being done?

*Id.* at 353-54 (quoting *Seaman*, 204 Wis. at 163). "[T]he three elements and the four vital questions of the *Seaman* test are intertwined and closely related," and the case law "implicitly recognize[s] that the four vital questions are intended to

---

WAJ's argument is not persuasive because this court's holding in *Ehr* has since been abrogated by amendments to the statute. In *Ehr*, we stated that "[t]he necessary implication of" the statutory phrase "who makes a claim for compensation," as used in WIS. STAT. § 102.29(6)(b) (2015-16), "is that a temporary employee who does not make a claim for compensation under the Act is not prohibited from bringing a tort claim against his or her temporary employer." *Ehr*, 380 Wis. 2d 138, ¶14. After *Ehr* was issued, the Wisconsin Legislature amended various provisions of § 102.29 to change the language from "who makes a claim for compensation" to "who has the right to make a claim for compensation." *Compare* WIS. STAT. § 102.29(6) (2015-16) *with* § 102.29(6); *see also* 2017 Wis. Act 139. Under the current version of the statute, whether Demars had *the right* to make a claim for compensation under the Act is ultimately the proper consideration, not whether he did or did not make a claim or if the claim was against Bosk or FMG. Further, neither § 102.29(6) nor (7) specify that the claim be made against a particular employer. Thus, we reject WAJ's argument.

facilitate analysis of the three-elements aspect of the *Seaman* test." *Borneman*, 219 Wis. 2d at 355-56, 358.

¶33 Our supreme court has also recognized, however, that "[t]he *Seaman* test is often difficult to apply," and "[t]he prior cases are difficult to fit together because the test is so 'fact-oriented.'" *Borneman*, 219 Wis. 2d at 354 (quoting *Gansch*, 158 Wis. 2d at 750).

> Over the years this court has acknowledged the deficiencies of the *Seaman* test as well as the confusing and sometimes conflicting case law interpreting and applying it. On more than one occasion the court has expressed dissatisfaction with the application of the *Seaman* test, declaring that "this court, as well as others, has found the question of the 'loaned employee' troublesome. The definition and factual essentials necessary to establish the legal relationship of the loaned employee are not uniform in all the reported cases, nor is the same emphasis always to the necessary elements." *Gansch*, 158 Wis. 2d at 751. Although the test is "readily comprehensible, when applied to specific factual situations, the distinctions are sometimes slight and the decisions well-nigh irreconcilable." *Freeman v. Krause Milling Co.*, 43 Wis. 2d 392, 394, 168 N.W.2d 599 (1969).

*Borneman*, 219 Wis. 2d at 354-55. "Despite the difficulties in applying the *Seaman* test," however, "neither courts nor commentators have devised a better one." *Borneman*, 219 Wis. 2d at 355.

¶34 Here, Demars bases his arguments on the four vital questions of the *Seaman* test. In particular, he challenges the circuit court's decision on these four grounds: (1) whether Demars "consented to a new employment relationship"; (2) whether Demars deviated from performing Bosk's work at the time of his injury; (3) whether Demars' work was controlled by Bosk or by FMG; and (4) whether FMG benefitted from Demars' work.

17

### a. Employee Consent

¶35 Demars' first challenge is whether he "actually or impliedly consent[ed] to work for" FMG—*Seaman*'s first element and first vital question. *See Seaman*, 204 Wis. at 163. Our supreme court has stated that "the consent of an employee to enter into a new employment relationship with a borrowing employer is the most critical inquiry in the *Seaman* test." *Borneman*, 219 Wis. 2d at 356. While "consent cannot be implied merely from the fact that the employee obeyed the commands of the general employer in performing work for a special employer," an employee who works "willingly" "under the direction" of the special employer impliedly consents to that working relationship. *Bauernfeind*, 190 Wis. 2d at 715. The circuit court must determine "whether an employee consented to leave his or her general employment and to enter into a new employer-employee relationship, if only of a temporary nature." *Borneman*, 219 Wis. 2d at 357. Further, there is "a presumption that an employee remains in the employ of the general employer." *Id.*

¶36 Our case law has established several ways that consent may be established. The first pertains to the second *Seaman* element: "Actual entry by the employee upon the work of and for the special employer pursuant to an express or implied contract so to do." *Seaman*, 204 Wis. at 163; *see also Borneman*, 219 Wis. 2d at 360 ("[T]he existence of an arrangement or understanding between a general employer and a borrowing employer is relevant to the issue of an employee's consent to enter into a new employment relationship with the borrowing employer."). However, a "formal" contract or agreement is not required; rather, "an express or implied agreement, or lack thereof," between the employers is "a factor bearing on the issue" of whether the employee consented to work for the borrowing employer. *Borneman*, 219 Wis. 2d at 359.

Further, consent can be inferred from an employee's words or acts which demonstrate his or her state of mind. *See Bauernfeind*, 190 Wis. 2d at 715.

¶37    Under the undisputed facts in this case, we agree with the circuit court that Demars consented to work for FMG. First, there was an express agreement between Bosk and FMG, and that agreement provided painters employed by Bosk to FMG at an hourly rate to work on specific projects. Demars was engaging in that contracted work at the time of his injury.

¶38    Second, while Bosk directed Demars to work for FMG, the record demonstrates that Demars did more than merely obey Bosk's direction. While working at FMG, Demars and the others in Bosk's paint crew would begin their day in "muster meetings" with both Bosk and FMG employees where the FMG foreperson would instruct them what "needed [to be] done that day." Demars' testimony confirmed that the FMG foreperson, not the Bosk foreperson,[13] would "tell [Bosk employees]" what they would be doing that day and assign specific tasks to individual members of Bosk's paint crew. The Bosk foreperson confirmed that she did not "have any input as to where people were going to work." The FMG foreperson testified that he would "walk the job sites and go through all the employees and check on them" to ensure they were working safely, and he had the authority to stop their work if needed. Thus, based on this record, Demars worked under the direct supervision of FMG, which was "telling the workers what to do and how to do it." *See Bauernfeind*, 190 Wis. 2d at 715.

---

[13] The Bosk foreperson's deposition testimony confirmed that she had been "labeled" as a Bosk foreperson, but she clarified that she did not hold any supervisory duties at FMG. She stated, "I was labeled the foreman, but I was hired at [FMG] as a painter …. When I was at [FMG], I was a worker." Bosk's designation of her as a "foreman" simply meant that she "was in charge of [timekeeping] paperwork" for Bosk.

Further, Demars has not identified any evidence that he refused to obey any of FMG's directions.

¶39    Finally, Demars demonstrated his implied consent by accepting Bosk's assignment to work for FMG. According to the record, Bosk's employees, "when placed with a certain client or assigned to a certain project, have the ability to request placement with a different client or reassignment to a different project if they so wish" based on "geographical, philosophical, or other reasons." Demars, however, never requested replacement or reassignment while placed at FMG. At the time of his injury, Demars had been a Bosk employee for approximately thirty years, and he had been working on projects for FMG for ten of those years. Based on these facts, we conclude that Demars impliedly consented to work for FMG.

¶40    Demars counters this conclusion with several arguments. Initially, he argues that the terms of the agreement between FMG and Bosk expressly prevented Demars from becoming a loaned employee of FMG. The agreement states: "[Bosk] is an independent contractor and its employees and agents are not the employees or agents of [FMG]." Thus, he claims that the agreement established his "employment relationship" and that should be honored.

¶41    We concur with the circuit court that this provision in the agreement, identifying that Bosk's employees are not employees of FMG, is irrelevant. The agreement does not state that Bosk employees "are not the *loaned* employees of FMG." Further, neither WIS. STAT. § 102.29(7) nor the *Seaman* test suggest that a loaned employee must become an *actual* employee of the borrowing employer. In fact, such a requirement is contrary to the purpose of the loaned employee doctrine because if the worker *were* an actual employee of the borrowing employer, rather than a loaned employee, then the exclusive remedy provision could apply by

20

virtue of WIS. STAT. § 102.03(2) and not § 102.29(7). Thus, the agreement's term, stating that Bosk's employees are not employees of FMG, is not determinative of whether Demars is considered a loaned employee.[14]

¶42 Next, Demars asserts that he did not impliedly consent to work for FMG "because no new employment relationship was created." (Formatting altered.) For support, he cites **Borneman** for the proposition that "the first consent [element] was not intended to ask if the [p]laintiff impliedly consented to work for the borrowing employer. Instead, the first **Seaman** [element] requires an employee to consent to leave his or her general employer and enter into a *new employer-employee relationship*." According to Demars, the "[circuit] court made no finding that a new employer-employee relationship was created," and the record, instead, demonstrates that he "had been performing his work for Bosk at the [FMG] premises in the same manner he had worked for years." He also argues that he never impliedly consented to work for FMG because he "never consented to enter into an employment agreement with" FMG.

¶43 We conclude that Demars misinterprets the consent element under *Seaman*. The best summary of Demars' argument is his statement that the *Seaman* "consent [element] was not intended to ask if the [p]laintiff impliedly consented *to work for* the borrowing employer" but, instead, "requires an employee to consent to leave his or her general employer and enter into a *new*

---

[14] We will not further address the cases cited by Demars on this issue. We do note, however, that Demars improperly cites an unpublished per curiam opinion in violation of WIS. STAT. RULE 809.23(3). Demars appears to be aware of RULE 809.23(3)(b) because he cites to it, but he fails to properly apply the statute under the circumstances. We admonish counsel that violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2).

*employer-employee relationship*." (First emphasis added.) The literal language of the ***Seaman*** consent element requires "[c]onsent on the part of the employee *to work for* a special employer," and the first vital question asks, "Did the employee actually or *impliedly consent to work for* a special employer?" ***Seaman***, 204 Wis. at 163 (emphasis added). Thus, Demars' representation that those are *not* the questions the consent element was "intended to ask" is not accurate.

¶44 To the extent Demars is claiming that the test has developed beyond the literal language of the original ***Seaman*** test, we agree that it is common in our legal system for appellate courts to develop guidelines through case law to assist circuit courts in making legal determinations, and the ***Seaman*** test is no different. We note, however, that Demars' statement that "the first ***Seaman*** [element] requires an employee to consent to leave his or her *general employer* and enter into a new employer-employee relationship" entirely misstates the quote in ***Borneman***. (Emphasis added.) There, the court actually stated that "[t]he essence of the ***Seaman*** test … lies in determining whether an employee consented to leave his or her *general employment* and to enter into a new employer-employee relationship, if only of a temporary nature."[15] ***Borneman***, 219 Wis. 2d at 357 (emphasis added). The distinction between leaving an employer versus leaving

---

[15] Demars also states that "[n]o 'new relationship' was created" between himself and FMG because the circuit court "found that at the time of the injury, [he] had been performing his work for Bosk at the [FMG] premises in the same manner he had worked for years." If Demars' argument is meant to suggest that there is a time element to the test under ***Seaman Body Corp. v. Industrial Commission of Wisconsin***, 204 Wis. 157, 235 N.W. 433 (1931), we disagree. The court's use of the term "new" in ***Borneman v. Corwyn Transport, Ltd.***, 219 Wis. 2d 346, 580 N.W.2d 253 (1998), does not suggest that the court meant that the employer-employee relationship needs to "have[] recently come into existence," but rather that the relationship be "different from one of the same category that has existed previously." *See New*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/new (last visited Aug. 14, 2024). The fact that Demars had been doing the same work at FMG for ten years is not, in and of itself, evidence that he was not a loaned employee.

one's general employment is important given that our supreme court stated that "it is not necessary … that a borrowed employee leave the employ of his or her general employer in order to become the borrowed employee of another. An employee can remain in the employ of both employers." *Phelps*, 319 Wis. 2d 1, ¶43 (footnote and citation omitted).

¶45 Regardless, we disagree that *Borneman* supports Demars' position. In *Borneman*, Monty Szydel was employed as a truck driver by Corwyn Transport, which contracted with Major Industries to haul furniture from Wisconsin to Georgia. *Borneman*, 219 Wis. 2d at 350. Szydel's role was to drop off a trailer truck at Major Industries, where it was to be loaded by employees of Major Industries, and then he was to pick up the loaded trailer for transport to the intended destination. *Id.* When Szydel arrived to pick up the trailer, however, the trailer was not yet loaded and, for unknown reasons, Szydel assisted Major Industries' employees in loading the trailer. *Id.* Of note, neither company compensated Szydel for helping to load the trailer, and there was no arrangement between the companies that Szydel would help load the trailer. *Id.* at 350-51. As the trailer was finished being loaded, part of the contents fell on an employee of Major Industries, causing his death. *Id.* at 351. In the resulting wrongful death action, the circuit court granted Corwyn's motion for summary judgment on the ground that Szydel was a loaned employee of Major Industries, and this court reversed that decision. *Id.* at 351-52.

¶46 The plaintiff in *Borneman* challenged our decision on the basis that we had both incorrectly applied and modified the *Seaman* test. *Borneman*, 219 Wis. 2d at 355. Our supreme court disagreed, concluding that we "properly focused" on whether Szydel "consented to a new employee-employer relationship with Major Industries" and that we properly recognized that "the existence of an

arrangement or understanding between a general employer and a borrowing employer is relevant to the issue of an employee's consent to enter into a new employment relationship with the borrowing employer." *Id.* at 358, 360. Ultimately, the court determined that Szydel was not a loaned employee of Major Industries because "the two employers did not have a prior arrangement or understanding to loan Szydel or any other employee to Major Industries to load the trailer," "Szydel's job as truck driver did not require him to help load the trailer," "[h]e was not compensated by either employer for helping to load the trailer," and "Szydel was paid only for delivery of the load to the intended destination." *Id.* at 360.

¶47 ***Borneman*** is entirely factually distinct from the case at bar. According to Demars, he is like Szydel because he "never consented to enter into a new employment agreement with" FMG. However, Demars misunderstands the basis of the ***Borneman*** decision. Our supreme court explained:

> It is one thing for Szydel to have assisted the employees of Major Industries with loading the trailer and an entirely different matter for Szydel to have consented to enter into an employment relationship with Major Industries. The record does not support an inference that Szydel consented to employment with Major Industries for purposes of loading the trailer. Szydel's cooperation with the employees of Major Industries in the loading process was not sufficient to rebut the presumption that Szydel remained in the employ of Corwyn Transport.

*Id.* at 360-61. Corwyn and Major Industries had contracted for Szydel to transport furniture from Wisconsin to Georgia by trailer but not to transport the furniture *into* the trailer. Further, the court observed that Szydel "was not compensated by either employer for helping to load the trailer," and he "was paid only for delivery of the load to the intended destination." *Id.* at 360. Thus, the court concluded that

Szydel did not meet the definition of a loaned employee "for purposes of loading the trailer." *See id.*

¶48 Here, there is no dispute that at the time of his injury, Demars was engaging in the work that Bosk and FMG had contracted for him to do. Demars even admits that "[n]othing about his activities on the day of his injury [was] different or unusual from his activities on a typical day." Further, unlike in *Borneman*, Bosk was paid for Demars' work, and Bosk, in turn, paid Demars for the specific work he was engaging in when the incident occurred. Therefore, *Borneman* does not support Demars' position.

¶49 Next, Demars argues that neither he nor any of his Bosk coworkers "consented to enter into an employment agreement with" FMG. In support of his position, Demars cites deposition testimony from Bosk employees that they considered themselves and Demars to be Bosk employees and that they never witnessed Demars explicitly consent to become an employee of FMG. He also cites testimony of an FMG employee stating that, as far as he knew, Demars never consented to "an employment relationship" with FMG.

¶50 Demars' purported evidence is immaterial to the loaned employee analysis. As Bosk recognizes, "[t]he issue is not whether Demars consented 'to enter into an employment contract with [FMG],' as [Demars] suggests." (Second alteration in original.) Our case law explaining the loaned employee doctrine does not require that a loaned employee provide explicit consent or enter into a formal employment agreement with the borrowing employer. Again, if a formal employment agreement between the employee and the borrowing employer were necessary, as discussed above, that requirement could make the employee an

*actual* employee of the borrowing employer and would render WIS. STAT. § 102.29(7) meaningless.

*b. Work Performed*

¶51     The next vital question of the *Seaman* test is: "[w]hose was the work he [or she] was performing at the time of injury?" *Seaman*, 204 Wis. at 163. Demars argues that he was doing Bosk's work because he "never deviated from the same tasks and assignments he performed pursuant to the Bosk-[FMG] contract. At the time of the injury, [Demars] was performing painting services which [was] Bosk's business."

¶52     We conclude that the circuit court properly determined that Demars was performing FMG's work at the time of his injury. According to Bosk's president's affidavit, "the arrangement between Bosk" and FMG "was a 'time & attendance' contractor, meaning that Bosk … provided painters to [FMG] to work on [FMG's LCS] project." Thus, Bosk's agreement with FMG was not to provide a finished product; instead, Bosk's "work" in its agreement with FMG was to "provide[] [FMG] people." The finished product was the LCS project under FMG's agreement with the federal government, and Bosk was not a party to that contract. As the court reasoned, "[w]hile true that the work being done was painting, the painting was being done on the LCS project," and, "[u]ltimately, the only reason Bosk employees like Demars were painting at [FMG's] facility was because [FMG] needed to perform under that defense contract." Demars was assisting FMG in fulfilling its obligations under its contract with the federal government.

¶53     Demars' arguments to the contrary overly complicate this aspect of the *Seaman* test. First, Demars claims that the circuit court "disregarded the

***Borneman*** presumption that Demars remained a Bosk employee." (Formatting altered.) He cites ***Borneman*** for the following proposition:

> In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he [or she] is performing the business entrusted to him [or her] by the general employer. There is no inference that because the general employer has permitted a division of control, he [or she] has surrendered it.

***Borneman***, 219 Wis. 2d at 357 & n.6 (collecting cases and quoting RESTATEMENT (SECOND) OF AGENCY § 227 cmt. b (1958)). What Demars fails to note, however, is that the presumption that the "employee remains in the employ of the general employer" is clearly rebuttable based on "evidence to the contrary." *See **id.*** Here, as noted above, there was sufficient evidence in the record demonstrating both that Demars had implicitly consented to a new relationship with FMG to do FMG's work and that he did not remain in his general employment with Bosk at the time of the incident.

¶54 Next, Demars argues that the cases the circuit court relied on to reach its decision on this element—***Bauernfeind***, ***Seaman***, and ***Phelps***—are inapplicable because "[i]n each of those cases, the employee made clear deviations from the work typically performed by their existing employer to assist the special employer." However, Demars cites no authority in support of his argument that such deviation is required or determinative of ***Seaman***'s work-performance vital question or that a loaned employee cannot perform the same type of work for the borrowing employer that he or she otherwise performs for the general employer. *See **Pettit***, 171 Wis. 2d at 646; *see also supra* ¶33 (discussing the difficulty of comparing prior cases because the ***Seaman*** test is fact oriented).

### c. Right to Control

¶55 The third element of the *Seaman* test asks whether the borrowing employer had the "[p]ower … to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue." *Seaman*, 204 Wis. at 163. In other words, the vital question is who had "the right to control the details of the work being performed?"[16] *Id.* We conclude that FMG had that right.

---

[16] We pause here to note that Bosk states: "All that is required to establish the 'control' [element] under *Seaman* is that the special employer maintained 'some control' of the work performed by the loaned employee." We disagree that "some control" is the standard for the loaned employee doctrine under *Seaman*.

Bosk cites *Kaelber Plumbing & Heating v. LIRC*, 160 Wis. 2d 342, 465 N.W.2d 829 (Ct. App. 1991), for this proposition. There, this court stated, "It is no longer necessary that the borrowing or special employer have exclusive control over the details of the loaned employee's work activities; all that is needed is that the special employer have some control over the work activities." *Id.* at 351 n.4. In making that statement, we relied on *Gansch* to conclude that "the statutory definition of a 'temporary help agency,' [WIS. STAT. § 102.01(2)(f)], was applicable to determining the loaned employee issue[.]" *Kaelber*, 160 Wis. 2d at 350-52 (footnote omitted) (citing *Gansch*, 158 Wis. 2d at 750-52). However, in *Bauernfeind*, our supreme court stated unequivocally that WIS. STAT. § 102.29(6)

> was intended to replace the *Seaman* test only with respect to employees of a temporary help agency. The *Seaman* test remains intact with respect to all other alleged loaned employees who make a claim against a temporary employer. Thus, employees of a temporary help agency are subject to the statutory test, while all persons alleged to be loaned employees remain subject to the *Seaman* test.

*Bauernfeind*, 190 Wis. 2d at 712. The statement in *Kaelber* pertaining to "some control" was in reference to § 102.01(2)(f) (1989-90), which defines a temporary help agency. *Kaelber*, 160 Wis. 2d at 351 & n.4; *see also Gansch*, 158 Wis. 2d at 750-52. Accordingly, because our supreme court has stated that different tests apply to loaned employees and employees of temporary help agencies, we do not understand the loaned employee case law to require only "some control" in the hands of the borrowing employer.

¶56    We agree with the circuit court that whether FMG had the *right* to control Demars' work begins with the terms of the agreement. As noted above, FMG contracted with Bosk for the sole purpose of utilizing Bosk's painters to help fulfill its defense contracts. According to the record, Bosk often "contracts with commercial clients on a task completion basis" whereby a client hires Bosk to undertake an entire project, Bosk "controls the tasks and work of its employees and provides all of the workers and equipment necessary for completion of the project," and the client pays Bosk a lump sum upon completion.

¶57    Bosk's arrangement with FMG as a "time & attendance" contractor was different. FMG compensated Bosk based on an agreed hourly rate for Bosk's workers, Bosk's employees logged their hours in FMG's timekeeping program, and Bosk's workers were prohibited from bringing any material to FMG's facility because FMG provided "all material and equipment necessary" for Bosk's employees to complete the work for FMG. Further, FMG retained the rights to test Bosk's employees "to verify their qualifications," to require Bosk's workers to take direction from the FMG forepersons, to discipline and/or dismiss Bosk's workers from its facilities, and to require Bosk's workers to follow FMG's workplace rules and procedures.

¶58    Additionally, as discussed above, *see supra* ¶¶38-39, according to the evidence in the record, while Bosk would place its employees "with a certain client or assign[] [them] to a certain project," Bosk's workers who were placed at FMG "were required to and did take direction from fore[persons] and other supervisors of [FMG] with respect to the actual work and tasks they were performing on the [LCS] project" pursuant to the daily "muster meetings." Bosk's foreperson at FMG did not control the details and/or assign tasks with respect to the work on FMG's LCS project. Because Bosk was not a party to FMG's defense

contract, it needed to rely on FMG to give appropriate instructions to Bosk's employees about what was required under that contract. Under the circumstances, these facts demonstrate that FMG had the right to control the details of the work being performed by Demars.

¶59     Demars, in contrast, denies that his work was controlled by FMG. According to Demars, FMG, "as a typical general contractor, coordinated Bosk employees' activity, but Bosk controlled the details of [Demars'] work."[17] Specifically, he first states that Bosk "maintained its own supervisors at the site." However, as we have already addressed, *see supra* ¶38 & note 13, Bosk's alleged foreperson at the FMG facility explained that she was "labeled the foreman" but that simply meant that she completed timekeeping paperwork. She clarified: "When I was at [FMG], I was a worker." FMG's supervisor confirmed this fact. Thus, we reject this argument.

¶60     Further, in support of his position, Demars cites deposition testimony from FMG's safety coordinator that she was *told*[18] she did not need to investigate Demars' injury because "it was a Bosk employee supervised by a Bosk

---

[17] We note that Demars' arguments on this issue all appear to focus on the control element as "weighed under the circumstances of Demars'[] activities that day" or, put another way, FMG's "lack of control over Demars at the time of the incident." In general, then, Demars' arguments demonstrate a lack of understanding of the control element of the *Seaman* test, which considers "the *right* to control the details of the work being performed" and the "[p]ower of the special employer to control the details of the work to be performed and to determine how the work shall be done and whether it shall stop or continue." *See Seaman*, 204 Wis. at 163 (emphasis added). Thus, whether FMG had literal control over Demars, and how much, on the day of his injury may be factors to consider to determine whether FMG had the right or power to control the details of Demars' work. Nevertheless, neither of these factors are required or determinative under *Seaman*.

[18] FMG's safety director allegedly told FMG's safety coordinator to stop her investigation. Demars, however, did not cite the safety director's deposition testimony in support of this statement.

person." Demars' alleged evidentiary support is not well taken. We observe that the safety coordinator also testified that she had no "independent knowledge … as to whether or not the specifics or the details of the work" Demars was "performing on the date of the incident were things that were assigned by [an FMG] supervisor or project coordinator or someone in a foreperson role." Thus, even apart from possible hearsay concerns, the safety coordinator's testimony has no bearing on the question of the "right to control the details of the work" under the control element of the *Seaman* test.

¶61 Demars next argues that FMG's supervisor "was not controlling" Demars' work because he "was a hundred yards down the ship when the incident occurred" and "was not working right alongside Demars." In support, Demars relies on *Bauernfeind*, where the plaintiff—an employee of Penda Corporation— was injured while moving materials in Penda's warehouse after the plaintiff's supervisor instructed him to "work for" Coleman-Zell Construction, a subcontractor hired to install industrial storage racking. *Bauernfeind*, 190 Wis. 2d at 707-08. The plaintiff "went to the warehouse and proceeded to work under the supervision of [Coleman-Zell], who was 'running the floor' and telling the people involved in installing the racking system what they should do and how they should do it." *Id.* at 708.

¶62 According to Demars,

> Penda did not have a supervisor in the warehouse or give instructions to [the] plaintiff on what to do, Penda was not in the business of installing storage racking but relied on [Coleman-Zell] to do it, [the p]laintiff was working in a location where he typically did not work, [and for o]ver two hours, working side-by-side together, [Coleman-Zell] gave [the plaintiff] specific instructions on what to do and how to do it which were followed until the time he was injured. In fact, a [Coleman-Zell] supervisor stood over the plaintiff and instructed him as follows: "Mr. Zell instructed me to snap the bandings because I was the only one there

> not holding onto the bundle, and so I took the tin snips … and proceeded to cut the bands and pull the bands from out under the bundle."

(Citation omitted.) Demars claims that unlike Coleman-Zell in ***Bauernfeind***, FMG "did not maintain control over the details of Demars'[] work," and "Bosk maintained its own supervisors at the site."

¶63 On this issue, we agree with the circuit court that "Demars is arguing in too literal a sense." According to the FMG supervisor's deposition testimony, at the beginning of the day he was responsible for "hand[ing] out jobs to all the people, get them going, make sure they have all the tools they need to do their job, [and] make sure they're doing it safely."[19] He further explained that he would "walk the job sites and go through all the employees and check on them all," and he agreed that his "primary responsibility" was "supervisory with respect to the painters," which applied equally to Bosk employees and FMG employees.

¶64 Demars has cited no legal authority for the proposition that the control element of the ***Seaman*** test *requires* that the borrowing employer be literally standing over the employee controlling his or her work. Instead, this element asks whether the borrowing employer has "the *right* to control the details of the work being performed" and the "[*p*]*ower* … to control the details of the

---

[19] Demars, seemingly in contrast, relies on deposition testimony from his coworker, Kenneth Knight, stating that "we kind of got our jobs, and then we'd go over there and verify with the [FMG] foreman what they wanted us to do." He asserts, based on Knight's statement, that "[e]very morning, Bosk employees, including Demars and his coworker, Ken Knight, attended *Bosk muster meetings* where the Bosk employees got their orders for the day" and would, thereafter, "verify their assignments with" FMG. (Emphasis added.) However, Demars' *own* deposition testimony, in addition to the Bosk foreperson's and the FMG foreperson's testimony, affirms that FMG's supervisor would give the Bosk employees their assignment for that given day and tell them "what they needed done today." Demars also agreed during his deposition that FMG would go so far as to direct individual Bosk employees to do certain tasks.

work to be performed and to determine how the work shall be done and whether it shall stop or continue." *Seaman*, 204 Wis. at 163 (emphasis added). As the circuit court observed, "The evidence supports the conclusion that Bosk was retained because its union-trained painters had the expertise and experience on similar projects to be able to come in and work on the LCS project with minimal direction and supervision." Thus, unlike the factual situation in *Bauernfeind*, the Bosk employees did not need over-the-shoulder supervision because they were doing a job they customarily did. We concur with the court's assessment that the agreement and Bosk's president's affidavit "make clear that this was not a situation where Bosk was coming in to *direct* a project, rather, [*FMG*] retained Bosk to apply its expertise *where* [*FMG*] *told it to apply it*."

### d. Primary Benefit

¶65 The final vital question under the *Seaman* test is: "For whose benefit primarily was the work being done?" *Seaman*, 204 Wis. at 163. The circuit court determined "that the work Demars was doing at the time of his injury, i.e., painting the vessel, was clearly being done for [FMG's] benefit." Demars calls this determination "confounding" because the court "apparently ignored the fact that Bosk benefitted from its business of painting, coating and sandblasting (and providing painters) and Demars benefitted by earning a paycheck." He claims that "[t]he question the [circuit] court should have asked is whether Demars received any new benefit for his work with a borrowing employer. Had that analysis been done, the answer would clearly have been 'no.'"

¶66 Again, Demars relies on *Bauernfeind* for support. There, according to Demars, Coleman-Zell "needed additional manpower to accomplish their goals," and the plaintiff "deviated from his usual tasks to provide additional

manpower and reduce [Coleman-Zell]'s workload," which benefited Coleman-Zell. *See Bauernfeind*, 190 Wis. 2d at 716. Here, Demars argues, "as a Bosk employee, Demars was performing Bosk duties—painting. While he performed his tasks, he was not reducing [FMG's] workload. It did not expedite [FMG's] assignments. Demars was performing the role for which Bosk hired him, with no new benefit to any party. His work benefited Bosk." In support, Demars notes that "Bosk earned approximately $36.54 for every hour [Demars] worked for them at [FMG]," based on Bosk charging FMG more per hour than Bosk was paying Demars for his work.

¶67 Demars' arguments conflict with the language of the primary-benefit vital question of the *Seaman* test, which asks for "whose benefit primarily was the work being done?" *See Seaman*, 204 Wis. at 163. There is no requirement within that language that the benefit be a *new* benefit. Thus, Demars' claim that "[h]e cannot be considered to be a loaned employee of [FMG] when no *new* benefit was conferred" is in conflict with the language in *Seaman*, and Demars fails to cite any legal authority to support his position.[20] *See Pettit*, 171 Wis. 2d at 646.

¶68 Furthermore, the test in *Seaman* specifically uses the word "primarily." *Seaman*, 204 Wis. at 163. "Primarily" means "essentially; mostly;

---

[20] Demars cites the court of appeals' decision in *Borneman v. Corwyn Transport, Ltd. (Borneman II)*, 212 Wis. 2d 25, 567 N.W.2d 887 (Ct. App. 1997), for the proposition that "[a]nother factor which may tend to show that an employee consented to work for a special employer is whether the employee received any *new* consideration or benefit by doing so." This court's discussion of "new consideration," however, was in the context of the consent element of the *Seaman* test, not the primary-benefit vital question. *Borneman II*, 212 Wis. 2d at 36. Demars cites no other legal authority for his assertion that "new consideration" is a factor to consider under the *Seaman* primary-benefit vital question.

chiefly; principally" or "in the first instance; at first; originally." *Primarily*, DICTIONARY.COM, https://www.dictionary.com/browse/primarily (last visited Aug. 14, 2024). Thus, our supreme court's use of the term "primarily" demonstrates the court's understanding that there may be others that benefit from an employee's work, but the question is focused on what or who *primarily* benefits from that work. Thus, Demars' argument that his work also benefited both Bosk and himself misses the point.

¶69 We agree with the circuit court's conclusion that the work performed by Demars was *primarily* for FMG's benefit. As the court explained, "The only reason Bosk and [FMG] contracted was because [FMG] had been awarded the defense contract," and, therefore, "every coat of paint Demars applied went towards finishing [FMG's] end of the LCS project." Based on the fact that FMG entered into an agreement with Bosk, it is clear to this court that FMG required additional workers in order to complete or to avoid a delay in completing the LCS project pursuant to its contract with the federal government. Thus, while both Bosk and Demars were being compensated, "the work being done"—i.e., the painting—was primarily for FMG's benefit to complete the LCS project.

¶70 Accordingly, we conclude that Demars was a loaned employee under WIS. STAT. § 102.29(7), and his suit against FMG was therefore barred under the Act. The circuit court did not err by dismissing Demars from this case.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.